(Nos. 71154, 71155 cons

THE PEOPLE *ex rel.* NEIL F. HARTIGAN, Attorney General, *et al.*, Appellants and Cross-Appellees, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellees and Cross-Appellants.

*Opinion filed April 16, 1992.—Rehearing denied June 1, 1992.*

FREEMAN, J., concurring in part and dissenting in part.

Neil F. Hartigan and Roland W. Burris, Attorneys General, of Springfield (Robert W. Cushing, G. Darryl Reed, Janice Dale and MaryNic U. Foster, of Chicago, of counsel), for the People.

Howard A. Learner and Robert L. Jones, Jr., of Chicago, for appellant and cross-appellee Business & Professional People for the Public Interest.

358

Robert L. Graham, and Norman M. Hirsch, of Jenner & Block, and Susan L. Satter, all of Chicago, for appellant and cross-appellee Citizens Utility Board.

Kelly R. Welsh, Corporation Counsel, of Chicago (Patrick Giordano, Special Assistant Corporation Counsel, of Foley & Lardner, and Jean Dobrer, of counsel), for appellant and cross-appellee City of Chicago.

Allen W. Cherry, of Chicago, for appellants and cross-appellees Community Action for Fair Utility Practice *et al.*

David Gilbert, of Chicago, for appellant and cross-appellee Governor's Office of Consumer Services.

John P. Meyer, of Danville, for appellant and cross-appellee Department of Transportation.

Gilbert A. Cornfield, of Cornfield & Feldman, of Chicago, for appellant and cross-appellee Labor Coalition on Public Utilities.

Cecil A. Partee and Jack O'Malley, State's Attorneys, of Chicago (Thomas H. Rowland and Sheila Macmanus, Assistant State's Attorneys, of counsel), for the People of Cook County.

Stephen J. Moore and M. Kathleen Nolan, Public Counsel, and Stephen E. Fogel, Deputy Public Counsel, of Chicago, for the People *ex rel.* Office of Public Counsel.

Howard J. Trienens, R. Eden Martin, Michael I. Miller and Dale E. Thomas, of Sidley & Austin, and Kevin M. Forde, all of Chicago, for appellant and cross-appellee Commonwealth Edison Co.

Edward P. O'Brien and John P. Kelliher, Special Assistant Attorneys General, of Chicago, for appellee and cross-appellant Illinois Commerce Commission.

Randall Robertson and Edward C. Fitzhenry, of Lueders, Robertson & Konzen, of Granite City, for appellee and cross-appellant Illinois Industrial Energy Consumers.

JUSTICE BILANDIC delivered the opinion of the court:

Pursuant to section 9—201 of the Public Utilities Act (Act), Commonwealth Edison sought an increase in the rates charged to its customers before the Illinois Commerce Commission (Commission), the statutorily authorized ratemaking agency. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1—101 *et seq.*) Edison sought this rate increase to recoup $2.55 billion in costs it incurred in constructing its Byron Unit I nuclear generating facility (Byron I). This consolidated appeal involves several judicial and administrative orders which subsequently flowed from Edison seeking this rate increase.

This is the second time that this case has been before this court. (See *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120 (*Hartigan I*).) The parties to this appeal are Commonwealth Edison (Edison), the Commission, and 11 consumer and governmental intervenors. The intervenors are: the People of the State of Illinois *ex rel.* Roland Burris; Business and Professional People for the Public Interest; Citizens Utility Board; City of Chicago; Community Action for Fair Utility Practice; Illinois Department of Transportation; Labor Coalition on Public Utilities; National Peoples Action; People of Cook County *ex rel.* Jack O'Malley; People of the State of Illinois *ex rel.* Office of Public Counsel; and South Austin Coalition Community Council

(collectively, intervenors). In addition, we have accepted an *amicus curiae* brief from Illinois Industrial Energy Consumers. Because the instant appeal involves several different orders entered by various courts and the Commission, it is necessary to set forth the procedural aspects of this case in some detail.

## PROCEDURAL FRAMEWORK

In October 1985, following an audit and rate proceedings, the Commission issued a rate order allowing Edison an annual rate increase of approximately $495 million (Rate Order I). This rate increase represented what the Commission determined to be reasonable costs incurred by Edison in constructing Byron I. The Commission disallowed as unreasonable a total of $101.5 million of costs that Edison had incurred in constructing Byron I. Since Rate Order I, years of litigation have ensued among Edison, the Commission, and the intervenors. The instant appeal is the latest aspect of this ongoing litigation.

Following the Commission's decision in Rate Order I, intervenors appealed that decision to the circuit court pursuant to section 68 of the Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 72). On April 29, 1986, the circuit court reversed the Commission order and remanded the cause to the Commission for further proceedings. The circuit court found that the Commission had applied an incorrect standard in determining which costs were reasonable and therefore includable in the new rate base. The circuit court held that only costs which Edison affirmatively proved to have been reasonable were includable in the new rate base. The court, therefore, ordered the Commission to "roll back" the $495 million annual rate increase established in Rate Order I. The court also ordered Edison to establish revised rates within 30 days which were to remain in effect pending further proceed-

ings before the Commission and were not to include any of the costs of Byron I construction. The court further ordered the Commission to exclude various costs related to Byron I from its final rate base determination on remand.

Thereafter, upon emergency motion by Edison, the circuit court stayed enforcement of its judgment on May 16, 1986, pursuant to Supreme Court Rule 305(b) (134 Ill. 2d 305(b)) (May 1986 stay order). However, since the stay order would enable Edison to continue to collect, throughout the appellate process, the $495 million annual rate increase which the circuit court had found to be illegal, the circuit court predicated its stay order upon the following conditions: (1) Edison was to create a separate account on its books reflecting the difference between rates collected after April 29, 1986 (the date of the circuit court's judgment reversing Rate Order I), and the rates that would have been collected without Byron I costs included in the rate base; (2) Edison was to file bimonthly reports of the status of this account with the circuit court and serve them on the parties; (3) if the circuit court's judgment should be affirmed in part and reversed in part, Edison was required to pay refunds to its historical customers (to the extent practicable); (4) the circuit court would determine the appropriate interest rate for any refund emanating from Rate Order I; and (5) the circuit court was to retain jurisdiction to enforce these conditions. In predicating its stay order on these conditions, the circuit court made provision for the refund of money collected under Rate Order I in the event that this court affirmed its April 1986 decision on the merits.

Thereafter, we allowed the intervenors' petition for leave to appeal directly to this court pursuant to Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)). All parties appealed the circuit court's April 1986 decision on

the merits. No party, however, appealed the circuit court's May 1986 stay order.

In *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120 (*Hartigan I*), this court affirmed the circuit court's reversal of the Commission's Rate Order I. The court agreed with the circuit court holding that the Commission had applied an improper standard in determining which costs of Byron I were reasonable and includable in the new rate base. The court reversed, however, as beyond its statutory authority, that part of the circuit court's holding which ordered the Commission to set certain rates within a limited amount of time and to exclude certain costs from its ultimate rate determination. We also noted that the remedy of a refund as set forth by the circuit court was "allowable," leaving the question open as to which body, the Commission or the circuit court, was authorized to dictate the terms and implementation of the refund. The court then remanded the cause to the Commission for further ratemaking proceedings consistent with its decision.

On remand, the Commission enlisted Arthur Young & Company (Arthur Young) to conduct a second audit of the Byron I costs and conducted exhaustive evidentiary hearings. On August 23, 1989, the Commission issued a new rate order in which it determined that $291.1 million of the $2.55 billion Byron I costs were unreasonable and disallowed them from Edison's rate base. The Commission also ordered Edison to refund to its customers the money it had collected under Rate Order I during the period of May 1, 1986, through December 31, 1989. The Commission set the interest rate of the refund at 5% to be compounded annually.

On September 5, 1989, the Commission issued a supplemental order which set forth the following terms for the refund: (1) the applicable interest rate is 5% com-

pounded annually; (2) the total refund payment is $194.6 million to be paid in two installments; and (3) refunds are to be paid to current customers by crediting their current monthly bills. We will hereinafter refer to these two Commission orders on remand collectively as Rate Order II.

The Commission reserved for rehearing the question of whether the refund should be based on the amount actually collected pursuant to Rate Order I or on projected revenues estimated in Rate Order I. The petition for rehearing was denied, however, by operation of law when the Commission failed to act on it within the time allotted by statute.

Simultaneous with the Commission's consideration and issuance of Rate Order II, the circuit court received briefs and heard arguments from the parties concerning its retained jurisdiction over the refund process and the various terms necessary to implement and administer a refund which it had outlined in its May 1986 stay order. On October 12, 1989, the circuit court entered an order entitled "Jurisdictional Statement" in which the court emphasized that its grant of the May 1986 stay order was expressly conditioned upon, *inter alia*, its retained jurisdiction to set the terms of any potential refund and to implement and administer said refund. The circuit court noted that the Commission was not statutorily authorized to refund money collected pursuant to a rate order entered by it but later set aside on appeal. Thus, the circuit court found that the refund terms of the Commission's Rate Order II were pure *dicta*. The court noted that no party had appealed the stay order or any of its conditions and that Edison had received a substantial benefit from the order.

More importantly, however, the circuit court determined that its statutorily based review jurisdiction authorized by the Act (Ill. Rev. Stat. 1983, ch. 111⅔, par.

72) terminated when it entered its April 1986 order which reversed and remanded the Commission's Rate Order I. The circuit court insisted that its May 1986 stay order and its conditions resulted from an act of discretion emanating from inherent *judicial* authority pursuant to Supreme Court Rule 305(b) (134 Ill. 2d R. 305(b)). Therefore, the circuit court found, its refund jurisdiction survived until its stay order and conditions were accomplished.

Pursuant to its jurisdictional statement, the circuit court issued a series of refund-related orders (collectively, circuit court's refund order) in which it set forth the terms and methodology of the refund. The circuit court ruled that: (1) the interest rate will be 9% compounded annually; (2) the refund will be based on the actual amount collected under the discredited Rate Order I; (3) the refund period will run from April 30, 1986, through December 31, 1989; (4) the refund will be paid to historical customers who had paid the illegal rates to the extent practicable; and (5) the refund was to begin in March 1990. The appellate court, however, later stayed the circuit court's refund order pending appeal.

The refund terms set forth in the circuit court's refund order directly conflict with the Commission's refund terms set forth in Rate Order II. Thus, one of the issues this court must decide is which body is authorized to dictate the terms of and to implement any refund of money collected under Rate Order I which may be due to Edison's customers.

In the interim of these proceedings, the legislature amended the Act, effective January 1, 1986, directing that Commission rate orders are to be reviewed by the appellate court rather than the circuit court. Because of this amendment, the parties appealed directly to the appellate court contesting the Commission's Rate Order II, the circuit court's refund order, and the circuit court's

determination that it, rather than the Commission, retained subject matter jurisdiction over the terms and implementation of the refund from Rate Order I.

On appeal, the appellate court affirmed the Commission's findings and conclusions in Rate Order II regarding the reasonable Byron I costs allowable in Edison's rate base. The appellate court, however, held that, based on the Act, the Commission had jurisdiction over the terms and implementation of the refund. (202 Ill. App. 3d 917, 959-61 (*Hartigan II*).) Therefore, the appellate court reviewed only the Commission's Rate Order II and the refund terms set forth therein. The appellate court affirmed the portion of Rate Order II which set the interest rate at 5% to be compounded annually and its determination that payment should go to Edison's current customers. The appellate court, however, reversed that part of Rate Order II which included 1989 revenues in the instant refund. The appellate court found that, since the rates set for 1989 had previously been reversed by this court in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192 (*Business & Professional People I*), the proper 1989 rates were as yet undetermined and, therefore, the appropriate refund amount for 1989 was unascertainable. Therefore, the appellate court held that the refund period at issue in the instant case runs from March 30, 1986, through December 1988. Finally, the appellate court remanded to the Commission the issue of whether the total refund amount should be based on actual dollars collected under Rate Order I or on the projected revenues estimated in Rate Order I. The appellate court further directed that if, on remand, the Commission determines that the refund should be based on actual dollars collected, it must also offset these revenues with any increase that Edison experienced in actual operating expenses.

The parties have appealed the appellate court's judgment in *Hartigan II* to this court pursuant to Supreme Court Rule 315 (134 Ill. 2d R. 315). The issues in the instant appeal concern: (1) various Commission findings in Rate Order II regarding reasonable and unreasonable delays in the operation of Byron I and the methodology employed by the Commission to quantify the costs associated with unreasonable delay; (2) whether the Commission or the circuit court has jurisdiction over the terms and implementation of the refund associated with Rate Order I; and (3) the terms and conditions of the refund associated with Rate Order I.

## OPINION

On appeal, the parties take issue with various Commission findings of fact. The Commission is the administrative agency responsible for setting rates that public utilities may charge their customers. (Ill. Rev. Stat. 1985, ch. 111⅔, pars. 9—102 through 9—202; *Hartigan I*, 117 Ill. 2d at 142.) The Commission is the fact-finding body in the ratemaking process. (*Hartigan I*, 117 Ill. 2d at 142.) It is governed by the Public Utilities Act (Act) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1—101 *et seq.*) and the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1985, ch. 127, par. 1001 *et seq.*). The Commission's powers are limited to those granted by the legislature in the Act. *Business & Professional People I*, 136 Ill. 2d at 201.

Because the Commission is an administrative agency, judicial review of its orders is limited. (*Business & Professional People I*, 136 Ill. 2d at 204.) Although the Commission is not required to make findings regarding every step, its findings of fact must be sufficient to allow for informed judicial review and will be affirmed if they are based on substantial evidence in the record. (See Ill. Rev. Stat. 1985, ch. 111⅔, pars. 10—201(e)(iii) through

(e)(iv); *Yowell v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1935), 360 Ill. 272, 275-76.) The Commission's findings of fact are *prima facie* correct and will not be overturned by a reviewing court unless they are against the manifest weight of the evidence, beyond the Commission's statutory authority, or violative of constitutional rights. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 206; *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 95.) Moreover, the burden of proof is on the party appealing the Commission's order. Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201(d).

The Commission's interpretation of a question of law, however, is not binding on a reviewing court. (*Business & Professional People I*, 136 Ill. 2d at 204.) Upon review of a Commission order, the court may, in whole or in part, reverse and set aside the order, affirm the order, or remand the cause to the Commission for further proceedings. (*Hartigan I*, 117 Ill. 2d at 142.) Although the reviewing court cannot direct the Commission to take a specific action (*Hartigan I*, 117 Ill. 2d at 142) or judicially set utility rates (*Hartigan I*, 117 Ill. 2d at 142), the court may suspend rates which it has found to be illegal (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—204(a)).

## I.

## RATE ORDER II

Edison and the intervenors challenge the propriety of several Commission determinations regarding Rate Order II. Both Edison and the intervenors contend that several of the Commission findings of reasonable/unreasonable delays and the corresponding costs incurred in the construction of Byron I are unsupported by the evidence. The intervenors also challenge the methodology employed by the Commission in quantifying the costs as-

sociated with the periods of unreasonable delay. The Commission argues that its findings of reasonable/unreasonable delay and associated costs are supported by substantial evidence in the record. The Commission also argues that the method it used to quantify the unreasonable costs incurred due to unreasonable periods of delay was proper and supported by the evidence.

## A.

### Reasonable Costs Includable in Rate Base

Under the Act, costs which the Commission has found to be reasonable are included in Edison's new rate base, while costs found to be unreasonable are disallowed. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—213; *Hartigan I*, 117 Ill. 2d at 132-33.) The determination of whether a cost is includable in or disallowable from the utility's rate base is the essence of the Commission's ratemaking duties. In proceedings to add the costs of a utility's new electrical generating facility to its rate base, the Commission is governed by, *inter alia*, section 9—213 of the Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—213). Section 9—213 provides in pertinent part:

> "The cost of new electric utility generating plants and significant additions to electric utility generating plants shall not be included in the rate base of any utility *unless such cost is reasonable*. Prior to including the cost of plants or additions to utility plants in the rate base, the Commission shall conduct an audit of such costs in order to ascertain whether the cost associated with the new generating plant or the addition to electric utility generating plant is reasonable. \*\*\* Any such audits shall be conducted in accordance with generally accepted auditing standards and shall include but not be limited to costs associated with materials, labor, equipment, professional services and other direct and indirect costs.
> \*\*\*

'Reasonable', as used in this Section, means that a *utility's decisions, construction, and supervision of construction,* underlying the costs of new electric utility generating plants and significant additions to electric utility generating plants *resulted in efficient, economical and timely construction.* In determining the reasonableness of plant costs, the Commission shall consider the knowledge and circumstances prevailing at the time of each relevant utility decision or action." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—213.

Under section 9—213, the costs related to the construction of a new generating facility shall not be included in the utility's rate base unless they are found to be reasonable costs. (*Hartigan I,* 117 Ill. 2d at 132.) The utility must affirmatively establish the reasonableness of construction-related costs before such costs may be included in the utility's rate base. (*Hartigan I,* 117 Ill. 2d at 133.) A determination of reasonableness is a question of fact (*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 470), and will not be overturned unless it is against the manifest weight of the evidence (see *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 48-49).

The statutorily required audit is the "primary means by which the Commission is to determine the reasonableness of the costs associated with the construction of power plants." (*Hartigan I,* 117 Ill. 2d at 133.) If, however, the audit is deficient or there is doubt concerning the reasonableness of costs, the Commission may hear other affirmative evidence or may "deny the costs altogether if they are not shown to be reasonable." (*Hartigan I,* 117 Ill. 2d at 133-34.) "Only when the Commission is satisfied by the audit report or by other affirmative evidence" that the construction-related costs are reasonable may they be included in the utility's rate base. *Hartigan I,* 117 Ill. 2d at 134.

In its Rate Order II, the Commission adopted the finding of the auditor, Arthur Young, that $291.1 million in costs attributable to the construction and licensing of Byron I were unreasonable. The Commission determined that approximately $289.6 million of these costs were incurred as a result of 15.9 months of delay in Byron I's construction and operating schedules which the Commission found to be unreasonable. Therefore, pursuant to statute, the Commission disallowed the costs associated with this 15.9 months of unreasonable delay from Edison's rate base. (See Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—213; *Hartigan I*, 117 Ill. 2d at 134.) The Commission's finding that Edison unreasonably delayed Byron I's construction and operating schedule by a period of 15.9 months forms the basis of the parties' arguments with respect to Rate Order II.

## The Arthur Young Audit

In conducting its audit on remand, Arthur Young divided Byron I's construction schedule into five major construction periods (milestones). Milestones are the "critical paths" or major stages of construction which must be completed before further construction phases can begin. Within each milestone, Arthur Young determined what it considered to be a proper time table (mitigated schedule) for completion of that milestone. Arthur Young then compared this mitigated schedule with Edison's actual time table (as-built schedule) for that milestone and determined the amount of delay that elapsed during each milestone period. Arthur Young then determined whether the resulting delay during each milestone was reasonable or unreasonable delay.

In the first milestone, first concrete to nuclear steam supply system set (NSSS), the auditor found a delay of 8.5 months due to problems welding the supports for

Byron I's steam generators. The auditor found that this 8.5-month delay was reasonable.

In the second milestone, NSSS to hydrostatic testing, the auditor found a delay of 12.1 months. Arthur Young determined that 10 months of delay was reasonable. However, the auditor found that 2.1 months of delay during this milestone was unreasonable. The 2.1 months of unreasonable delay resulted from an electrical stop work order issued by Edison because of continuing quality assurance/quality control (QA/QC) problems Edison had been experiencing with one of its subcontractors, Hatfield Electric Company (Hatfield).

In the third milestone, hydrostatic testing to hot functional testing, Arthur Young found 11.8 months of delay. The auditor attributed 8.0 months of this delay to regulatory and structural/safety changes required throughout the nuclear power industry following the Three Mile Island nuclear accident in 1979. It found this 8.0-month delay to be reasonable. The auditor found that the remaining 3.8 months of delay during this milestone was due to internal delay on Edison's part. The auditor determined that the internal delay resulted from multiple causes, some of which were reasonable and some of which were unreasonable. Arthur Young concluded, however, that, because the reasonable causes would have resulted in the same 3.8-month delay, the reasonable causes "masked" the unreasonable causes. Therefore, Arthur Young found this 3.8-month delay to be reasonable.

In the fourth milestone, hot functional testing to fuel load, the auditor found 15.5 months of delay. Arthur Young found that 1.7 months of delay was reasonable. Arthur Young found that the remaining 13.8 months of delay consisted of overlapping periods of delay: 11.4 months of delay caused by Edison's slow response to fire protection issues; 11.6 months of delay in completing

preoperational testing; and 9.6 months of delay due to the Nuclear Regulatory Commission (NRC) Licensing Board's denial of an operating license for Byron I in January 1984. Arthur Young found the 13.8-month delay to be unreasonable.

In the fifth milestone, fuel load to commercial operation, Arthur Young found a 0.8-month delay to be reasonable.

Based on its mitigated schedule, Arthur Young determined that Byron I should have been ready to load fuel by July 7, 1983 (mitigated fuel-load date). The fuel-load date is the date by which the nuclear power plant should be licensed and operational. Byron I's as-built fuel-load date occurred in early November 1984. Consequently, Arthur Young found that Edison was responsible for a total of 15.9 months of unreasonable delay in the operation of Byron I.

In Rate Order II, the Commission accepted the auditor's determination that Edison was responsible for four separate periods of unreasonable delay which totalled 15.9 months. These four periods of unreasonable delay occurred as follows:

| TYPE OF DELAY | DATE | CAUSE | AMOUNT OF DELAY |
|---|---|---|---|
| 1. construction | 1/10/81—3/13/81 | electrical stop work order | 2.1 months |
| 2. construction | 9/9/83—8/20/84 | extended pre-operational testing | 11.6 months |
| 3. construction | 9/9/83—8/20/84 | fire protection problems | 11.4 months |
| 4. licensing | 1/13/84—11/2/84 | license denial | 9.6 months |

Since there were overlapping periods of unreasonable de-

lay, Arthur Young found, and the Commission agreed, that these delays unreasonably deferred the operation of Byron I by a total of 15.9 months. The Commission adopted the auditor's findings of 15.9 months of unreasonable delay and the July 7, 1983, mitigated fuel-load date and disallowed costs related to the unreasonable delay.

## Edison

As a preliminary matter, we note that the construction and operation of a nuclear-generating facility proceeds along two distinct but concurrent schedules of events: (1) the construction schedule for the physical plant, and (2) the licensing schedule involving the utility's application for an operating license from the NRC. On appeal, Edison does not challenge the Commission's findings of unreasonable delay in Byron I's construction schedule. Edison does, however, contest the Commission's determinations regarding the licensing schedule.

Edison takes issue with the Commission finding of a total of 15.9 months of unreasonable delay and the Commission's July 7, 1983, mitigated fuel-load date. Edison asserts that the Commission found that its conduct during the licensing litigation before the NRC was reasonable. Edison reasons that, therefore, any delay which resulted during the licensing litigation was reasonable. Edison argues that the reasonable delay in the licensing schedule "masks" any simultaneous, unreasonable delay in Byron I's construction schedule. Therefore, Edison argues that due to the "reasonable" delay resulting from the licensing litigation, the earliest date on which it could have loaded fuel at Byron I would have been April 1984 rather than the mitigated fuel-load date of July 7, 1983.

The Commission contends that its determination concerning Edison's conduct before the Licensing Board

was based on the facts as they existed when Edison was already embroiled in the contested proceedings. It argues, however, that, had Edison originally responded to NRC notices of deficiency differently, the subsequent licensing events would have occurred differently or may not have occurred at all.

In January 1984, for the first time in its history, the Licensing Board denied Edison an operating license for Byron I. This license denial resulted in 9.6 months of litigation before the Licensing and Appeal Boards of the NRC's licensing branch. The Commission found that the entire 9.6 months of licensing delay which ensued after January 1984 was unreasonable. Implicit in the Commission's mitigated fuel-load date, however, is the agency's determination that Edison should have received an NRC operating license for Byron I before July 7, 1983.

Under Federal law, a utility must provide reasonable assurances of safety *before it may receive an operating license*. In order to provide reasonable assurances of safety, NRC regulations require the owner of a nuclear power facility to establish and carry out an effective quality assurance and quality control (QA/QC) program. (10 C.F.R. §50, appendix B, criterion I (1991).) Although the owner may delegate the QA/QC function to others, compliance with each NRC requirement remains the owner's responsibility. *Commonwealth Edison Co.* (1984), 19 NRC 1163, 1170.

The litigation surrounding the licensing for Byron I began before 1980 and concerned "unresolved safety problems and quality assurance and control issues thought pertinent to the Byron facility." (*Commonwealth Edison Co.* (1982), 15 NRC 1400, 1419.) Quality assurance and control problems plagued Edison throughout the construction of Byron I. The Licensing Board found that Edison had:

"freely availed itself of its prerogative to delegate, but failed in its responsibility to assure that its contractors carried out their delegated quality assurance tasks." *Commonwealth Edison Co.* (1984), 19 NRC 36, 43.

As early as 1977, NRC Region III inspectors issued a notice of violation to Edison and informed Edison of deficiencies in its QA/QC program. (*Commonwealth Edison Co.* (1984), 19 NRC 1163, 1171.) In a March 1980 Region III inspection, NRC inspectors found:

> "[I]n spite of the three-year history of deficiencies in the SCC [Systems Control Corporation] QA Program and in equipment fabricated by SCC, Byron Station Construction Department personnel waived, without QA concurrence, final inspection of twenty safety-related local instrument panels at the SCC plant \*\*\*. The \*\*\* panels were then receipt inspected at the Byron Site by [Edison's] Station Construction Department, with no significant deficiencies noted, placed in the Unit I containment, and were later found, on reinspection in place, to require extensive repairs." (Emphasis added.) *Commonwealth Edison Co.*, 19 NRC at 133.

In the spring of 1982, Region III conducted a construction assessment team inspection to assess the QA/QC program at Byron I. It found, *inter alia*:

> "Based on a review of training qualification and certification records of a minimum of ten percent of the QA/QC personnel working for contractors performing safety-related work it is apparent that an effective program does not exist to ensure that a suitable evaluation of initial capabilities is performed, that written certification is provided in an appropriate form, and that qualification criteria is [sic] established.
>
> Certain contractor QA/QC supervisors and inspectors were not adequately qualified and/or trained to perform safety-related inspection functions." (*Commonwealth Edison Co.*, 19 NRC at 1171.)

The special team found that the QA/QC problems involved several Byron I contractors performing safety-re-

lated work, including Hatfield, Reliable Sheet Metal, Hunter Corporation, Blount Brothers and others. It found that there was wide variation in QA/QC inspector certification and training by Byron's contractors and that many inspectors failed to meet Federal qualification criteria. The construction assessment team attributed the variations to Edison's failure to establish a formalized program for contractors to follow. *Commonwealth Edison Co.*, 19 NRC at 196.

In addition, the construction assessment team found that serious problems existed with respect to nonconforming documentation control and the tracking of nonconforming conditions discovered during inspections. The failure of some of Edison's contractors to maintain a reliable system of nonconforming documentation control was first observed by Region III as early as 1978. *Commonwealth Edison Co.*, 19 NRC at 200.

Following the construction assessment team inspection, Region III determined that, in order to provide reasonable assurance of the safety of Byron I, Edison had to conduct a reinspection of safety-related work and an inspector recertification program. The reinspection program was "a very extensive and comprehensive program that look[ed] at *almost all of the work that ha[d] been completed at [the] plant that is safety-related.*" (Emphasis added.) (*Commonwealth Edison Co.*, 19 NRC at 206.) Although the construction assessment team report was issued in June 1982, Edison did not propose an acceptable reinspection program until February 1983. In August 1983, Region III staff met with Edison over its concern that Edison was "not maintaining a rigorous and dedicated control over the reinspection effort." *Commonwealth Edison Co.*, 19 NRC at 201.

Simultaneous to the inspection and reinspection activity at the Byron I facility, ongoing licensing litigation before the NRC Licensing Board transpired. In 1978, Edi-

son applied for an operating license. Several parties intervened, raising, *inter alia*, the QA/QC issues. In June 1982, due to discovery sanctions, the Appeal Board limited the issues the intervenors could raise to those that the "Licensing Board concludes it can comfortably decide on the merits *without unjustifiably delaying operation of the Byron facility.*" (Emphasis added.) (*Commonwealth Edison Co.* (1982), 15 NRC 1400, 1420.) The Appeal Board stated:

> "It is our understanding that [Edison] expects the facility to be ready for fuel loading towards the end of 1983. To the extent that the [intervenors have] serious contentions to raise *that cannot be litigated within this anticipated time frame*, we repeat *** [citation]:
>
>> 'As to those aspects of reactor operation not considered in an adjudicatory proceeding (if one is conducted), it is the staff's duty to insure the existence of an adequate basis for each of the requisite Section 50.57 determinations.' " (Emphasis added.) (*Commonwealth Edison Co.*, 15 NRC at 1420 n.36.)

The Appeal Board further stated:

> "The choice of which contentions the [intervenors] may still litigate is for the [intervenors] to decide in the first instance, *subject to the time constraint we have identified.* In other words, the [intervenors are] to rank [their] contentions individually for the Licensing Board and the Board will then limit them *based upon its understanding of the time needed to litigate those issues.* (We would not be surprised if fewer than ten contentions can be *timely heard ***.)*" (Emphasis added.) *Commonwealth Edison Co.*, 15 NRC at 1420 n.37.

The Appeal Board noted that its decision was in conformity with the NRC's policy statement, which provides, in part:

> "If [licensing] proceedings are not concluded prior to the completion of construction, the cost of such delay could reach billions of dollars. The Commission will seek to avoid or reduce such delays whenever measures are

available that do not compromise the Commission's fundamental commitment to a fair and thorough hearing process." (*Statement on Policy on Conduct of Licensing Proceedings* (1981), 13 NRC 452, 452-53.)

The Appeal Board released its decision in June 1982, the same month as the construction assessment team inspection report and Region III's determination that Edison would be required to conduct reinspection and recertification programs before a license would issue for Byron I.

During December 1982 and January 1983, pursuant to the Appeal Board's decision, the Licensing Board determined that the intervenors could litigate, *inter alia*, the QA/QC issues. In February 1983, Edison submitted an acceptable reinspection program. From March to May 1983, the Licensing Board conducted hearings and the QA/QC issues were litigated. In May 1983, the hearings ended and the record was closed. Since Edison had submitted its reinspection proposal to NRC staff only one month before the hearings began, no preliminary results were available to the Licensing Board when it was deciding what issues could be litigated or when it conducted the initial hearing. Moreover, it appears from the record that, at this time, the Licensing Board was not even aware of the reinspection program. *Commonwealth Edison Co.*, 19 NRC at 208.

In June 1983, the Licensing Board granted the intervenors' motion to reopen the record to take additional evidence with regard to "certain aspects of the quality assurance issue" and "directed the parties 'to present a full evidentiary showing and explanation of the pertinent investigations of Hatfield Electric's quality assurance program and the subsequent reinspections.' " (*Commonwealth Edison Co.* (July 1, 1983), Nos. STN 50—454 OL, STN 50—455 OL, at 1.) At the reopened hearings, the Licensing Board was "troubled and puzzled at the very

low information content" in the testimony of Edison's witnesses (*Commonwealth Edison Co.*, 19 NRC at 204), and expressed its "concern *** that [Edison] has done nothing of any significance to address the issue and has imparted a general sense of disinterest to the Board." (*Commonwealth Edison Co.*, 19 NRC at 206.) The Licensing Board concluded that Edison's "evidentiary response to the issue in the reopened hearing has been weak and borders default." *Commonwealth Edison Co.*, 19 NRC at 206.

It was not until October 1983 that Edison first submitted the preliminary results of its reinspection program. Of great significance, these results indicated that *the reinspection program did not identify any nonconformance in Hatfield's work that had safety significance.* On January 13, 1984, over nine months from the date the reinspection program began, Edison submitted the final results on the eve of the release of the Licensing Board's decision. On January 14, 1984, the Licensing Board denied Edison's application for Byron I, stating:

"The Board withholds authorization for an operating license for the Byron Nuclear Station because of inadequacies in [Edison's] quality assurance program." (*Commonwealth Edison Co.*, 19 NRC at 278.)

The Licensing Board came to its decision to deny Edison's operating license for Byron I without the benefit of the final results of the reinspection program.

In January 1984, Edison appealed the decision to the Appeal Board. In April 1984, the Appeal Board remanded the cause to the Licensing Board for further proceedings. From May 1984 to November 1984, the Licensing Board conducted further proceedings, including litigation of the reinspection program results. In November 1984, the Licensing Board granted Edison a Byron I operating license.

With respect to the licensing issue, the Commission found that Edison unreasonably delayed the submission of an acceptable reinspection program by six months. The agency determined that the reinspection program should have been submitted by August 1982, that the preliminary results should have been submitted by January 1983, and the final results should have been submitted in July 1983. It therefore found Edison responsible for the entire 9.6 months of litigation and delay which followed the Licensing Board's initial denial of an operating license in January 1984. Additionally, based on the Commission's mitigated construction schedule, the Commission determined that Edison should have been licensed and ready to load fuel on the July 7, 1983, mitigated fuel-load date. Therefore, the Commission found, in essence, that Edison was responsible for 15.9 months of unreasonable delay.

Edison counters that a July 7, 1983, fuel-load date was impossible because, from June to August 1983, the Licensing Board was conducting the reopened hearings and because the final results of the reinspection program also would have been litigated before the Licensing Board. Edison asserts that, given these two periods of litigation, the soonest it could have loaded fuel is April 1984. To support its argument, Edison points to: (1) the Licensing and Appeal Boards' refusal to delegate the QA/QC issue to the Commission staff for informal resolution and (2) the Commission findings that, with the exception of the six-month unreasonable delay in submitting the reinspection program, Edison's conduct during the licensing proceedings and the reinspection was reasonable. Therefore, Edison argues, the licensing litigation was a reasonable cause of delay which would mask any unreasonable delay in the construction schedule.

The intervenors and the Commission focus on Edison's unreasonable six-month delay in submitting the

reinspection program and the consequences which flowed from this initial delay. They assert that, had Edison begun the reinspection program in August 1982, all the licensing events that followed would have been different. Essentially, these parties argue that Edison is responsible for the consequences which flowed from Edison's initial, unreasonably slow response in submitting the reinspection program to the NRC.

Upon review, it must be borne in mind that the Commission's findings of fact, *i.e.*, that the operation of Byron I was unreasonably delayed by 15.9 months, are *prima facie* correct and are entitled to great deference. (See Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201(d).) We rely on the Commission's technical expertise in this area. A reviewing court will affirm the Commission's findings of fact if these findings are supported by substantial evidence in the record. (See Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201(e)(iv)(A).) The burden in this case is on Edison to: (1) put forth evidence and (2) persuade the trier of fact. The Commission, by law, must disallow costs that Edison fails to prove reasonable. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—213; *Hartigan I*, 117 Ill. 2d at 134.) As the appellate court properly stated:

> "The Commission is qualified through experience and special study to evaluate the workings of the nuclear regulatory process. We must rely on the Commission's expertise in this regard. The Commission has determined that the licensing procedure would have proceeded differently had Edison made a timely response to the NRC. *** [T]he Commission has made a fair inference, *based on the record*, and supported with a reasoned analysis." (Emphasis added.) *Hartigan II*, 202 Ill. App. 3d at 943.

Having undertaken an exhaustive review of the record, we find substantial evidence therein to support the Commission's finding that Byron I should have been ready and licensed to load fuel by July 7, 1983. The rec-

ord supports the reasonable inference that, had Edison submitted its reinspection program six months earlier than it did, the licensing litigation schedule would have been vastly different.

In light of the Appeal Board's language in its June 1982 decision and the NRC's policy statement, it is a reasonable inference from the evidence that the Licensing Board would have delegated the QA/QC issue to the Commission staff had Edison submitted its reinspection program in August 1982 and the preliminary results in January 1983. The Licensing and Appeal Boards' refusal to delegate this issue came only after the issue was extensively litigated in both the initial and the reopened hearings. The Licensing Board included the QA/QC issue in the licensing litigation *before* Edison even formulated an acceptable reinspection proposal. Moreover, at the initial hearings conducted from March to May 1983, Edison had only *begun* reinspecting when it otherwise should have had the preliminary results available as evidence for the Licensing Board to consider.

The record also substantially supports the Commission's inference that, had Edison begun the reinspection program earlier and submitted the preliminary results in January 1983, the Licensing Board would not have reopened the record in June 1983. In its reopening order, the Licensing Board expressly stated that it was reopening the record to gather evidence related to QA/QC problems with Hatfield and the reinspection program. It is obvious that, since the preliminary results showed no safety-related problems concerning Hatfield's work, there would have been no reason to reopen the record if these results had been available to the Licensing Board. Moreover, taking into account the 2.1 months of unreasonable delay in the second milestone, even the final reinspection results, which confirmed the preliminary results, should have been available at the time of the mo-

tion to reopen. In addition, there also is ample evidence in the record to support the Commission inference that, had the reinspection program begun earlier, it would have been completed in less time than the actual reinspection program because it would not have interfered with hot functional testing. Therefore, the Commission's inference that the Licensing Board would not have reopened the record is substantially supported.

Furthermore, in light of the NRC's policy statement, it is apparent that, had the final results been submitted by May 1983 (rather than by July 1983, a delay of 2.1 months), any litigation or informal resolution concerning these results would have been expedited if Byron I was ready, construction-wise, to load fuel by July 7, 1983. Finally, we note that Edison was on notice from Region III that there were significant QA/QC problems with its Byron contractors as early as 1978. Edison is responsible for QA/QC and it knew it had to provide reasonable assurance of Byron I's safety. If Edison had dealt with the QA/QC issue in a responsible manner, we have no doubt that much of the licensing litigation that transpired could have been avoided.

We conclude that the Commission's finding of a July 7, 1983, mitigated fuel-load date is supported by substantial evidence in the record and we affirm the appellate court on this issue. We find that the licensing litigation, to a large extent, resulted from Edison's unreasonable six-month delay in initiating the reinspection program. Absent Edison's tardy response to Region III's construction assessment team report, in the very least, the reopened hearings would not have been necessary and the Licensing Board's January 1984 license denial would not have occurred. Edison failed to meet its burden to persuade the Commission that, due to reasonable causes, it *could not have* loaded fuel in July 1983.

In affirming the appellate court on this issue, we reject Edison's argument that the licensing litigation, which the Commission found to be reasonable, masked any unreasonable construction schedule delays. The finding that Edison's conduct during the licensing proceedings and the reinspection program was reasonable is a finding that the Commission made in light of the actual circumstances as the events unfolded. This finding is entirely different from the Commission's determination that Byron I should have been licensed and ready to load fuel by July 7, 1983 absent the unreasonable delays which occurred. Edison is responsible for consequences which flow from its unreasonable actions or inaction. In the instant case, as a result of its unreasonable delay in beginning its reinspection program, Edison is responsible for the delay in Byron I operation which occurred beyond July 7, 1983.

## Intervenors

In their cross-appeal, the intervenors dispute certain Commission findings of reasonableness. The auditor, in analyzing the construction schedule, determined that there was a delay of 8.5 months in the first milestone period. This delay resulted from Edison's inability to properly weld steam generator lower lateral supports (supports) which support the Byron steam generators. Edison had experienced weld cracking and other problems with the supports in 1977. Edison employed internal investigators and outside firms to discover the cause of the welding failures. It evaluated possible procedural changes that might alleviate the problem. The root cause of the weld cracking, however, was never determined despite Edison's extensive efforts to discover it. Nor could Edison find a way to eliminate the problem. After several months of effort, Edison decided to change the supports' design from welded to bolted connections. Edison

sent the supports back to the fabricator for modification. By the time the modified supports were returned and bolted into place, 8.5 months of construction delay elapsed.

The auditor found that this 8.5 months of delay was reasonable. Arthur Young considered the knowledge and circumstances prevailing in 1977 and concluded that Edison's conduct which resulted in the 8.5 months of delay was reasonable. The Commission adopted the auditor's findings in regard to the welding problems and the 8.5 months delay.

Intervenors contend, however, that the Commission's finding that the 8.5 months of delay was reasonable is arbitrary and unsupported by the evidence. They argue that they presented extensive, unrebutted expert testimony which demonstrated that the welding failures were unreasonable in the first instance. Thus, intervenors argue, the resulting delay to correct the problem should have been found to be unreasonable. To support their argument, intervenors assert that this particular welded design and installation was common at that time throughout the nuclear power industry and had been successfully installed at many nuclear-generating facilities, including some of Edison's facilities. Intervenors claim that the fact that Edison had problems with the welding is, in itself, unreasonable and, therefore, the costs associated with this 8.5 months of delay should have been disallowed by the Commission.

Intervenors, however, have overlooked the fact that the audit and the auditor's testimony is the "primary means by which the Commission is to determine the reasonableness of the costs." (*Hartigan I*, 117 Ill. 2d at 133.) As such, the audit and Arthur Young's testimony is evidence upon which the Commission may base its findings of fact. Therefore, there is no merit in intervenors' assertions that they presented unrebutted expert testi-

mony and that the Commission's determination is unsupported by the evidence. The record reveals that Arthur Young thoroughly reviewed Edison's conduct with respect to the supports. It found that the cause of the welding failure was never determined and that Edison's investigation and subsequent decision to modify the design were reasonable at the time in question.

The Commission adopted Arthur Young's findings, noting that the proper standard to be applied is "reasonableness" rather than "perfection." The Commission found that, in large-scale construction projects, unforeseeable events are bound to occur and that related costs should not automatically be disallowed simply because one such event happened to occur. Applying the proper standard under section 9—213 of the Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—213), the Commission determined that, based on the knowledge and circumstances prevailing at the time, the 8.5 months of delay was reasonable. We conclude that this finding of fact is substantially supported by the record and affirm the appellate court on this issue.

Intervenors also dispute the Commission's finding that 3.8 months of internal delay in the third milestone was reasonable. The auditor determined that this 3.8 months of delay resulted from multiple causes, some of which were reasonable and some of which were unreasonable. Arthur Young found that concurrent reasonable causes of delay "masked" unreasonable causes and concluded that, absent the unreasonable causes, the 3.8 months of delay would have occurred anyway. Reasonable causes of this delay which were cited by Arthur Young included broken equipment, procurement delays, and final load checks of structural steel. Consequently, Arthur Young found that this 3.8-month period of delay was reasonable, and the Commission adopted this finding.

Intervenors assert that this finding is unsupported by the evidence. They argue that contemporaneous internal scheduling documents demonstrate that the "predominant" cause of the 3.8 months of delay was Edison's unreasonably slow rate of system turnovers from construction to preoperational testing. Intervenors note that Arthur Young's lead auditor testified that it had not reviewed these scheduling documents when it made the finding that the delay was reasonable. Therefore, intervenors argue, the Commission finding is arbitrary.

Intervenors, however, do not challenge the Commission's policy of allowing reasonable delays to "mask" unreasonable ones. The masking policy requires the auditor and the Commission to determine if there were any reasonable causes of delay which would have occurred even in the absence of any unreasonable causes and would have caused the same amount of delay in the construction schedule. "Masking" does not require a determination of which cause predominated over any other causes. All that is required is a determination of whether any reasonable causes of delay existed concurrent with the unreasonable cause of delay which would have had the same impact on the construction schedule as the unreasonable cause of delay. If a concurrent, reasonable cause existed, then the resulting construction delay will be found to be reasonable.

In the instant case, Arthur Young found that several reasonable causes existed concurrent with the slow construction turnover rate. The fact that the construction turnover rate was, *arguendo*, the predominant cause of delay does not render the other reasonable causes nonexistent. Therefore, it is irrelevant whether the auditor reviewed the internal scheduling documents. Moreover, the Commission did consider these documents as evidence and stated:

"Intervenors' arguments that contemporaneous scheduling documentation points to slow construction turnovers as being the critical path problem delaying construction confuses cause and effect ***. Intervenors have not considered the causes for slow construction turnovers in this time period. The Auditors' testimony recited above shows that concurrent delays occurred due to procurement and other reasonable causes ***." (Rate Order II, at 81.)

We conclude that there is substantial evidence in the record to support the Commission's finding that the 3.8 months of internal delay was reasonable and affirm the appellate court on this issue.

## B.

### AFUDC Methodology

Intervenors dispute the Commission's method of quantifying the costs related to the 15.9 months of unreasonable delay which were disallowed from Edison's rate base in the Commission's Rate Order II. In particular, intervenors argue that the Commission failed to disallow $80.6 million in "time-related indirect costs." In order to address this issue, we first set forth some basic concepts related to the quantification of unreasonable delay costs incurred by Edison in the construction of its facility.

Unreasonable costs which are disallowed from a utility's rate base are classified into two basic categories: (1) direct costs and (2) delay costs. Direct costs are costs which are activity related: they are costs which are directly related, indirectly related or a consequence of specific activities or issues, the expenditure of which was determined to be unreasonable. Direct costs are static and easily calculable. Delay costs, on the other hand, are costs which are time-related and would not have been incurred in the absence of unreasonable delay in the opera-

tion of the facility. Delay costs increase with the passage of time and their calculation involves time-value-of-money concepts. Both direct and delay costs also incur related "Allowance for Funds Used During Construction" (AFUDC) costs. AFUDC. represents the cost of carrying an expenditure once it is incurred until it is included in the utility's rate base. AFUDC represents the time-value or the cost of money. In the instant case, the Commission's finding of unreasonable direct costs and their corresponding AFUDC is not in issue. However, the Commission's calculation of the unreasonable delay costs related to the 15.9 months of unreasonable delay is in issue. Therefore, we will focus only on delay costs.

Delay costs are divided into several subcategories: (1) *escalation costs*, which include the increased cost of labor and materials resulting from the fact that the expenditure occurs later in time than it would have occurred in the mitigated schedule; (2) *time-related indirect costs*, which include costs that are dependent upon the project's duration rather than any particular construction activity or the general level of construction such as home-office overhead charged to a project; and (3) *AFUDC* related to these delay costs.

In determining how to quantify the unreasonable costs related to the 15.9 months of delay, the parties presented several different methodologies of quantification to the Commission. The auditor presented a methodology known as the "Present Value Revenue Requirements" (PVRR) method. The Commission, however, rejected the PVRR method because it included several subjective assumptions related to time-value-of-money concepts which the Commission found to be unsupported by the evidence. No party has appealed the Commission determination to reject the PVRR method and, therefore, we will not discuss this method further.

Intervenors also offered a method to quantify unreasonable delay costs known as the end-of-period AFUDC method. Under this method, the AFUDC which accrued beyond the point of delay is used as a reasonable approximation or proxy for the rate of escalation or the rate costs increased because of the unreasonable delay. Intervenors argued before the Commission and before this court that, in using the end-of-period AFUDC method to quantify unreasonable delay costs, the Commission must disallow not only the AFUDC which accrued after the July 7, 1983, mitigated fuel-load date, but also $80.6 million in time-related indirect costs. The $80.6 million figure is derived from the auditor's finding of $4.8 million per month of unreasonable time-related indirect costs. Intervenors maintain that $80.6 million should be added to the Commission's determination to disallow $291.1 million for a total disallowance of $371.7 million in unreasonable costs. Intervenors contend that failure to disallow time-related indirect costs over and above the disallowed AFUDC violates section 9—213 of the Act by including unreasonable costs in Edison's rate base.

The Commission, however, rejected intervenors' end-of-period methodology because: (1) it involved some of the same subjective assumptions related to time-value-of-money concepts as the auditor's PVRR method and (2) to include a separate disallowance for time-related indirect costs would constitute double counting of these costs in the disallowance. Instead, the Commission adopted a different version of the end-of-period AFUDC methodology in which it disallowed from the rate base the AFUDC which accrued beyond the mitigated fuel-load date but did not include a separate disallowance for the time-related indirect costs.

The appellate court correctly discussed the end-of-period AFUDC methodology and we quote from its opinion:

"The parties do not contend that the end-of-period AFUDC method measures the actual cost of time-related delay. Rather, AFUDC is one way of assessing the impact of schedule delay on a project without engaging in a complex analysis. Concededly, end-of-period AFUDC does not distinguish between AFUDC on reasonable or unreasonable expense, but merely measures the AFUDC for the last stage of construction regardless of the time in which the delay or cost occurred. In a conventional application of end-of-period AFUDC analysis, as explained by the auditor and a Joint Intervenors' witness, *the rate of escalation, or increased expense, is considered to be equivalent to the rate of AFUDC, or cost of money. Up to the point of delay, escalation and AFUDC are considered to be a trade off. The AFUDC which accrues after the point of delay is used to represent increased costs to the consumer, as the rate at which AFUDC increases is considered to be the same rate by which expenses escalate.* According to the audit report, if the ratepayer is called upon to meet expenses incurred due to delay without any traded benefit due to the cost of money, he is harmed. If in fact escalation rates are below AFUDC rates, employing the end-of-period AFUDC method overstates the harm to the ratepayer because he is experiencing some benefit from not having to pay for the increased expenses until a later date.

The controversy seems to boil down to whether one considers the *actual rate of escalation to be lower than the rate of AFUDC. If that is the case, then the difference between the rates acts to absorb the delay costs, including time-related indirect costs, without having to actually calculate them.* If one considers actual escalation rates to be equivalent to or greater than AFUDC rates, then using AFUDC to represent the delay costs falls short of accounting for all the costs associated with delay." (Emphasis added.) (*Hartigan II*, 202 Ill. App. 3d at 952.)

The appellate court also properly determined that the appropriate rate of escalation and the classification of time-related indirect costs are questions of fact for the

Commission to determine. *Hartigan II*, 202 Ill. App. 3d at 952.

However, in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175 (*Business & Professional People II*), we remanded to the Commission the issue of whether its end-of-period AFUDC methodology subsumes time-related indirect costs, stating:

> "The Commission never made a specific finding regarding the amount of escalation or time-related indirect expense. Thus it is unclear how much of the amount disallowed is attributable to each component of delay expense. \*\*\*
>
> Because we are presented with only a summary finding that all unreasonable delay costs are subsumed by AFUDC, we are unable to make an informed judicial review of the Commission's finding that AFUDC subsumes all the time-related indirect costs. \*\*\* Therefore, with respect to a separate disallowance for time-related indirect costs, we hold that the Commission's findings of fact are insufficient to allow informed judicial review [citation], and we remand the cause to the Commission for more specific findings on this issue." (*Business & Professional People II*, 146 Ill. 2d at 218.)

In accord with our decision in *Business & Professional People II*, we remand this issue in the instant case to the Commission and direct it to make more specific findings related to the escalation rate during the relevant period of time, the rate of AFUDC, and time-related indirect expense. If the rate of AFUDC exceeds the escalation rate and the *calculable* time-related indirect expenses (see *Business & Professional People II*, 146 Ill. 2d at 218), then we find the Commission's end-of-period AFUDC methodology to be a "recognized form of quantification analysis" (*Hartigan II*, 202 Ill. App. 3d at 953), and to be supported by substantial evidence in the record.

## II.

## REFUND JURISDICTION

We now turn to the issue of whether the circuit court or the Commission lawfully possesses subject matter jurisdiction over the terms and implementation of the refund from the illegal rates collected pursuant to the Commission's Rate Order I. As stated above, the appellate court in the instant case held that the circuit court had no legal basis to exercise jurisdiction over the refund. (*Hartigan II*, 202 Ill. App. 3d at 955, 956.) The appellate court determined that Supreme Court Rule 305 (134 Ill. 2d R. 305) authorizes the trial court to stay enforcement of its judgment pending appeal. (*Hartigan II*, 202 Ill. App. 3d at 955.) The appellate court concluded, however, that issuance of this court's mandate in *Hartigan I*, which remanded the cause to the Commission for further ratemaking proceedings, terminated the appellate process and, consequently, the circuit court's jurisdiction over the case. *Hartigan II*, 202 Ill. App. 3d at 955.

The appellate court found that the remandment of the case to the Commission pursuant to the decision in *Hartigan I* revested jurisdiction in the Commission (*Hartigan II*, 202 Ill. App. 3d at 956), and that the Commission had statutorily based jurisdiction over the refund pursuant to the Act (*Hartigan II*, 202 Ill. App. 3d at 960). Therefore, the appellate court reviewed only the terms of the refund set forth in the Commission's Rate Order II. For the reasons which follow, we reverse the appellate court on this issue.

Under the Act, the Commission must set just and reasonable rates that a utility may charge its customers. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—101.) Once the Commission sets the utility's rates, the utility *must*

charge that rate. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—240.) That rate must remain in effect throughout the appellate process unless the reviewing court stays or suspends it. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—204.) *If no stay is obtained,* and the rate is reversed on appeal, the utility may continue to collect the challenged rates while the appeal is pending, but must refund that portion of the rate order which the reviewing court holds to be improper. *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 103.

In the instant case, the appellate court determined that the present refund from Rate Order I fell within the ambit of section 9—252 of the Act and apparently determined that the Commission had jurisdiction over the refund pursuant to this section. (See *Hartigan II,* 202 Ill. App. 3d at 959-61.) Section 9—252 provides in pertinent part:

> "When complaint is made to the Commission concerning any rate or other charge of any public utility and the Commission finds, after a hearing, that the public utility has charged an excessive or unjustly discriminatory amount for its product, commodity or service, the Commission may order that the public utility make due reparation to the complainant therefor, with interest at the legal rate from the date of payment of such excessive or unjustly discriminatory amount." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—252.)

As support for its conclusion that the present refund is based on section 9—252, the appellate court noted that, in *Hartigan I,* this court referred to the refund as the "ratepayers' claims for reparations for excessive rates" (*Hartigan I,* 117 Ill. 2d at 148). *Hartigan II,* 202 Ill. App. 3d at 959.

We find, however, that the appellate court has misconstrued the decision in *Hartigan I.* Although this court did refer to the ratepayers' claims for a refund as

"claims for reparations" in *Hartigan I*, it clarified that statement when it stated:

> "[T]he trial judge, upon Edison's motion, allowed Edison to collect the rate ordered by the Commission in [Rate Order I] but ordered the amount collected over and above the rate previously charged by the utility to be held in escrow, subject to ratepayers' *refund claims*. As discussed, *refunds* dating from the circuit court's reversal *are allowable under our decision in Independent Voters* \*\*\*." (Emphasis added.) *Hartigan I*, 117 Ill. 2d at 148.

In *Independent Voters*, 117 Ill. 2d 90, this court reaffirmed its decision in *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, holding that, in a situation where the Commission has approved rates as just and reasonable but those rates are later reversed on appeal, section 9—252 of the Act *does not apply*. (*Independent Voters*, 117 Ill. 2d at 96.) In *Mandel Brothers*, this court determined that rates approved by the Commission as just and reasonable rates could not be "excessive or unjustly discriminatory" for the purposes of awarding reparations even if those rates are later reversed by a reviewing court. (*Mandel Brothers*, 2 Ill. 2d at 209.) The *Mandel Brothers* holding was based on the statutory scheme of the Act which requires the utility to charge rates approved by the Commission throughout the appellate process *unless the reviewing court stays or suspends the new rates*. (*Mandel Brothers*, 2 Ill. 2d at 211.) The *Mandel Brothers* court reasoned that, because the utility is required to charge rates set by the Commission, these rates cannot be deemed to be excessive rates as a basis of a claim for reparations. *Mandel Brothers*, 2 Ill. 2d at 212.

The *Mandel Brothers* holding was reaffirmed by this court in both *Independent Voters* and *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195. We now reaffirm the *Mandel Brothers* holding for a

third time. The Commission, once it approved the rates in Rate Order I as just and reasonable rates, cannot now require Edison to pay reparations for those rates, even though Rate Order I was reversed on appeal. The Commission's function is legislative in nature and the rates that it sets are prospective in operation. (See *Mandel Brothers*, 2 Ill. 2d at 210.) To allow the Commission to now order "reparations" from rates that it originally set would violate the well-established rule against retroactive ratemaking. *Citizens Utilities Co.*, 124 Ill. 2d at 207, 209.

This court's holding in *Independent Voters*, however, went beyond the scope of *Mandel Brothers*. In *Independent Voters*, the Commission approved rates which this court later set aside. The court then remanded the cause to the Commission to conduct further ratemaking proceedings. Thereafter, intervenors in *Independent Voters* petitioned this court for a refund of overcharges collected pursuant to the portions of the rate order which the court had determined to be invalid. In addressing intervenors' petition, the court initially noted that no provision in the Act purports to take away a court's equitable jurisdiction (*Independent Voters*, 117 Ill. 2d at 100), nor could the legislature do so (*Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 42). The court determined that, once a rate order has been set aside on review, the utility may not continue to benefit from the invalid portions of the rate order. (*Independent Voters*, 117 Ill. 2d at 104.) Although, under *Mandel Brothers*, the Commission could not award reparations for excessive rates pursuant to the Act in this factual situation, this court decided:

> "*Peoples Gas Light & Coke Co. v. Slattery* [citation] made clear that this court *may exercise its equitable powers when an appropriate remedy is not provided in the Act* [citation]. The Act does not specifically provide a

remedy for this situation, although it provides for a court to review the lawfulness and reasonableness of Commission proceedings [citation]. Too, the unavailability of a refund would force the consumer to pay a rate that has been held to be in excess of that established under proper criteria and would raise due process questions. [Citation.]" (Emphasis added.) (*Independent Voters*, 117 Ill. 2d at 104.)

To alleviate this situation, this court in *Independent Voters* exercised its inherent powers to fashion an equitable remedy and, for the first time, ordered a refund of overcharges collected pursuant to the invalid portions of the rate order. In this regard, the court stated:

"[T]his court's decision holding that certain expenses and deductions allowed in the rate order were improper was final. That portion of the rate order was invalid from the time this court entered its judgment. The portion of the rates that was held to be erroneously set by the Commission should be refunded to customers who paid them ᵒ**. To hold otherwise would allow Bell to continue collecting the unlawfully increased rate and benefiting from such, without a remedy to the customer, until the Commission conducts hearings and determines a new rate base." *Independent Voters*, 117 Ill. 2d at 102-03.

In the instant case, the ICC-approved rates which were established in Rate Order I were set aside on appeal by the circuit court. This court affirmed the circuit court's reversal of Rate Order I. (*Hartigan I*, 117 Ill. 2d 120.) These facts present a situation similar to that of the factual situation that this court encountered in *Independent Voters*. (See *Independent Voters*, 117 Ill. 2d 90.) This court's decision in *Independent Voters* controls the instant case. Therefore, the refund of illegal rates collected under the Commission's Rate Order I is an equitable remedy made available to ratepayers pursuant to this court's equitable powers delineated in its decision in *In-*

*dependent Voters* and is not a statutorily based remedy, as the appellate court concluded.

The question that remains is whether the circuit court lawfully possesses subject matter jurisdiction over the terms and implementation of the refund from Rate Order I. In its jurisdictional statement, the circuit court held that its jurisdiction over the refund was based on its inherent judicial power flowing from Supreme Court Rule 305(b) (134 Ill. 2d R. 305(b)). In this regard, the circuit court stated:

"The May 16, 1986 Order was entered pursuant to Supreme Court Rule 305 and was an exercise of judicial discretion unrelated to the Public Utilities Act and well beyond the scope of anything which the [Commission] could have done itself. At the time of the Stay Order there was simply no law, statutory or caselaw, in Illinois which authorized a refund to consumers once a rate was declared to be illegal. The May 16th Order permitted Edison to continue to charge the illegal rate promulgated by the Commission's [Rate Order I] in *exchange for* Edison's acquiescence in a refund to consumers if this Court's declaration of illegality was not reversed upon appeal. On this issue the Circuit Court was affirmed by the Supreme Court. The benefits of the May 16th Order to both the utility and to the consumers were eminent and the assurances of a refund were unprecedented.

\* \* \*

Having promulgated an illegal rate the [Commission] was powerless to correct or unwind the process by granting refunds because the [Commission] is powerless to engage in retroactive ratemaking. It is thus clear that without the May 16, 1986 Order there simply never could have been a refund possibility. The Refund is the product of activity which was exclusively judicial and was not dependent upon anything contained in the Public Utilities Act nor reserved therein to the [Commission]. Retained jurisdiction in [*sic*] a commonplace prerogative utilized by courts to enforce their orders—that is how it is used in the Stay/Refund Order.

The jurisdiction which this Court originally obtained in the captioned case was based on Section 68 of the Public Utilities Act in force at that time. That statutory jurisdiction was exhausted when this Court entered its Order of April 29, 1986. The activities of May 16 were undertaken outside of the Public Utilities Act, were authorized by Supreme Court Rule 305 and were clearly the exercise of a discretionary authority well within this Court's inherent judicial powers. Jurisdiction for the Stay/Refund Order is based in legal concepts which are judicial in character and not on any statutory grant. That jurisdiction survives until performance under the order is completed or accomplished with finality." (Emphasis in original.) *People ex rel. Hartigan v. Illinois Commerce Comm'n* (Cir. Ct. Cook Co. Oct. 12, 1989), No. 85—CH—10970.

In order to determine whether the circuit court's May 1986 stay order properly retained jurisdiction over the terms and implementation of the refund pursuant to Supreme Court Rule 305(b), it is necessary to discuss the circuit court's "rollback" instruction in its April 1986 decision. In their briefs, Edison and the Commission have intimated that the circuit court's "rollback" order was an illegal order. Therefore, these parties suggest that the circuit court's May 1986 stay order amounted to a stay of a void order which cannot be the basis of the circuit court's retained jurisdiction over the refund from Rate Order I.

In its April 1986 decision on the merits, the circuit court reversed the Commission's rate increase established in Rate Order I, instructed the Commission to promulgate new revised rates within 30 days, instructed the Commission to exclude certain costs from these revised rates, and "rolled back" the $495 million annual increase set in Rate Order I.

In *Hartigan I*, Edison and the Commission challenged the circuit court's decision to reverse Rate Order

I, its instructions to the Commission, and its "roll back" of rates. This court affirmed the circuit court's decision to reverse Rate Order I. It determined, however, that many of the circuit court's instructions to the Commission regarding further ratemaking proceedings were beyond its authority and constituted judicial ratemaking. (*Hartigan I*, 117 Ill. 2d at 141-48.) The court stated:

> "[A] circuit court reviewing an order of the Commission may only affirm or reverse the order or remand the cause for further evidence. Directing the Commission to establish a specific rate is judicial ratemaking, a function that the legislature has charged to the Commission exclusively. The court had no authority to order a rollback, or return, to the prior rates. [Citation.] Moreover, the court may not impose a time limit within which the Commission, an agency created by the legislature, must perform its ratemaking function." *Hartigan I*, 117 Ill. 2d at 148.

We take this opportunity to clarify this court's earlier statement concerning the circuit court's lack of authority "to order a rollback, or return, to prior rates." The Commission is responsible for setting rates public utilities may charge its customers. (Ill. Rev. Stat. 1985, ch. 111⅔, pars. 9—102 through 9—202.) Under the statutory scheme, when Commission-approved rates are reversed by a reviewing court, the invalid rates remain in effect throughout the appellate process unless those rates are suspended or stayed by a court of review. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—204 (formerly Ill. Rev. Stat. 1983, ch. 111⅔, par. 75).) Section 10—204 of the Act authorizes the reviewing court to stay or suspend the invalidated rates while the parties appeal its decision with respect to the rate order. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—204.) Section 10—204 provides in pertinent part:

> "[T]he pendency of an appeal shall not of itself stay or suspend the operation of the rule, regulation, order or decision of the Commission, but *during the pendency of the*

*appeal* the reviewing court may *in its discretion stay or suspend, in whole or in part, the operation of the Commission's* rule, regulation, *order* or decision." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—204(a).

Although the circuit court cannot order a "rollback, or return, to prior rates" (see *Illinois Commerce Comm'n v. Chicago & Eastern Illinois Ry. Co.* (1928), 332 Ill. 243), the reviewing court may stay the *operation* of the new, invalidated rate order (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—204). If the new rates are stayed or suspended, it is the *Commission* which must determine what rates will be in effect during the appellate process. (See *Slattery*, 373 Ill. at 48.) The Commission is statutorily authorized to set temporary rates under certain conditions. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—202 (formerly Ill. Rev. Stat. 1983, ch. 111²/₃, par. 36).) If a court suspends the Commission's rate order, the *Commission* must determine whether prior rates will remain in effect during the appeal or whether it will set temporary rates to be in effect during the appeal process. Therefore, the circuit court in the instant case erred when it instructed the Commission to "rollback" the $495 million annual rate increase and *restore or return to the prior rates.* Furthermore, the circuit court has no authority to "rollback" or suspend rates retroactively to the date of the Commission's rate order.

In the instant case, however, the circuit court acted well within its statutory authority in staying or suspending, from the date of its decision throughout the appellate process, the $495 million annual rate increase established in Rate Order I. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—204; see *Hartigan I*, 117 Ill. 2d at 148.) Therefore, we find that, in its April 1986 decision, the circuit court, in effect, properly stayed or suspended the operation of the rate increase established in Rate Order I pursuant to section 10—204 of the Act (Ill. Rev. Stat. 1985,

ch. 111⅔, par. 10—204). The circuit court, however, improperly ordered the Commission to set revised rates which excluded all the costs of Byron I from Edison's rate base, the effect of which was to order the Commission to return to Edison's prior rates. In addition, as the circuit court properly noted, the entry of its April 1986 decision on the merits was a final judgment (*Independent Voters*, 117 Ill. 2d at 102), which terminated its statutory jurisdiction to review Commission orders (*Illinois Consolidated Telephone Co. v. Aircall Communications, Inc.* (1981), 101 Ill. App. 3d 767, 769).

In May 1986, however, the circuit court exercised its *judicial* authority under Supreme Court Rule 305(b) and granted Edison's motion to stay the enforcement of its April 1986 decision to suspend Rate Order I's $495 million annual rate increase. Supreme Court Rule 305(b) provides in relevant part:

"(b) ***

(1) On notice and motion, and an opportunity for opposing parties to be heard, the trial court, or the reviewing court or a judge thereof, *may stay pending appeal *** the enforcement, force and effect of any *** final or interlocutory judgment* or judicial or administrative order.

***

(3) The stay, whether granted by the trial or reviewing court, *shall be conditioned upon such terms as are just.*" (Emphasis added.) 134 Ill. 2d R. 305(b).

In granting its May 1986 stay order pursuant to Supreme Court Rule 305(b), the circuit court, as it correctly determined, was acting in a judicial capacity and exercising inherent equitable powers. Stay orders granted pursuant to Supreme Court Rule 305(b) are treated as preliminary injunctions. (See *Allied Contracting Co. v. Bennett* (1982), 110 Ill. App. 3d 310, 311.) A court's power to grant a stay is an equitable power to

enforce equitable principles. *Cahokia Sportservice, Inc. v. Illinois Liquor Control Comm'n* (1975), 32 Ill. App. 3d 801, 806.

The circuit court was authorized by Rule 305(b) to grant its stay "conditioned upon such terms as are *just.*" (Emphasis added.) (134 Ill. 2d R. 305(b).) In the instant case, as the circuit court stated, its decision to stay enforcement of its April 1986 judgment allowed Edison to collect invalidated rates throughout several years of appeals and remand. Therefore, the circuit court, pursuant to Rule 305(b), conditioned its stay order on retention of jurisdiction over the terms and implementation of any potential refund from money collected pursuant to the invalidated Rate Order I.

Under Supreme Court Rule 305(b), the trial court may condition a stay upon just terms. In determining whether the circuit court's retained jurisdiction was a just condition to granting Edison's motion for the stay order, we note that all parties benefitted from the stay order and its refund-related conditions. The circuit court expressly stated that it would not have granted Edison's motion to stay enforcement of its April 1986 decision *unless* that stay was conditioned upon its retained jurisdiction to dictate the terms of and implement any potential refund. By staying the enforcement of its April 1986 rate suspension, the circuit court allowed Edison to continue to collect the invalidated rate increase in Rate Order I for several years. Had the circuit court refused to stay its suspension of the invalidated rates, and this court later reversed the circuit court and reinstated Rate Order I, Edison could not have recovered any money lost during the appellate process because of the rule against retroactive ratemaking.

Intervenors, on the other hand, benefitted from the refund-related conditions of the stay order. The circuit court properly observed that, at the time it granted its

May 1986 stay order, there was no statutory or case law precedence for the equitable remedy of a refund. Without the circuit court's condition retaining jurisdiction over a potential refund, consumers may have been required to pay improper rates throughout the appellate process without a remedy. If the circuit court had not retained jurisdiction to establish a refund, either it would not have granted the stay or consumers may have been charged an improper rate for years without recourse. In addition, we note that, in its stay order, the circuit court laid the groundwork for the type of equitable refund which we later validated by this court's decision in *Independent Voters*. As stated in *Independent Voters*, this type of remedy is equitable in nature, and the circuit court in this case was acting in its equitable capacity. Therefore, we conclude that the stay order's condition that the circuit court retain jurisdiction over the terms and implementation of a refund is a just and equitable condition pursuant to Supreme Court Rule 305(b).

Furthermore, the appellate court erroneously concluded that the issuance of this court's decision in *Hartigan I* terminated the appellate process and any possible jurisdiction over the refund that the circuit court may have obtained. (*Hartigan II*, 202 Ill. App. 3d at 955.) On the contrary, the decision in *Hartigan I* remanded the cause to the Commission for further ratemaking proceedings. Remandment involves the continuation of the same case rather than the beginning of a new and distinct case. Therefore, the decision in *Hartigan I* did not terminate the circuit court's retained jurisdiction over the terms and implementation of a refund acquired pursuant to Supreme Court Rule 305(b). For these reasons, we reverse the appellate court on this issue and hold that the circuit court lawfully acquired and retained equitable jurisdiction over the terms and implementation of the refund pursuant to Supreme Court Rule 305(b).

## III.

## REFUND TERMS AND METHODOLOGY

Turning to the terms that the circuit court established pursuant to its retained, equitable jurisdiction over the refund, we note that the appellate court failed to review them. However, in the interest of judicial economy, we will address each of them in turn.

Pursuant to the provisions of the stay order and the circuit court's retained jurisdiction, the circuit court issued its refund order setting forth the terms and methodology of the refund from the Rate Order I rates. Intervenors argue that all of the circuit court's terms are equitable terms lying within the circuit court's discretion. Edison and the Commission argue, in effect, that the appellate court properly affirmed the terms of the refund set forth by the Commission in Rate Order II.

In setting the terms of the refund, the circuit court was acting in its equitable capacity and, therefore, had "considerable discretion *** in affixing appropriate conditions to [its] stay order." (*Henderson v. Graham* (1988), 167 Ill. App. 3d 256, 259.) Review of the refund order's terms is governed by equitable principles and the goal of equity is to make the aggrieved party whole. (See *In re Estate of Wernick* (1989), 127 Ill. 2d 61, 86.) These terms will be affirmed unless the circuit court has abused its discretion. (See *Wernick,* 127 Ill. 2d at 87.) Pursuant to Supreme Court Rule 305(b), these terms must be "just." 134 Ill. 2d R. 305(b).

### A

### Interest Rate

In its refund order, the circuit court set the interest rate for the refund at 9% to be compounded annually.

Intervenors argue that the 9% interest rate is reasonable, equitable, and within the circuit court's discretionary authority. Edison and the Commission, on the other hand, argue that the rate of interest is the legal rate or 5% pursuant to section 9—252 of the Act, as the appellate court so concluded. In this regard, the circuit court stated:

> "[I]t would be patently inequitable to permit Edison to amass approximately three hundred million dollars of illegal rates over three years and then repay it back at less than passbook rates. No rate of interest which assures a profit from delay is compatible with this Court's April 29, 1986 Memorandum Opinion—'fairness dictates that the utility not be enriched simply by the time delays inherent in the appellate process.' [Citation.]" *People ex rel. Hartigan v. Illinois Commerce Comm'n* (Cir. Ct. Cook Co. Oct. 12, 1989), No. 85—CH—10970 (interest rate order).

An equitable award of interest is a matter lying within the circuit court's sound discretion and is governed by equity's goal of making the customers whole. (*Wernick*, 127 Ill. 2d at 87.) Awards of equitable interest are subject to the concept of fairness and equity and are not to be interpreted as a penalty against the debtor (Edison). (*Wernick*, 127 Ill. 2d at 87.) They are made to compensate the consumer for the use of his funds. (*Wernick*, 127 Ill. 2d at 87.) Thus, the consumer will be compensated for any economic loss associated with the inability to use his money. *Wernick*, 127 Ill. 2d at 87.

With these principles in mind, we quote the circuit court's reasoning which led it to determine that the 9% interest rate was equitable:

> "—it is not fair and just for the Court to be oblivious to the present day inadequacy of the 5% interest rate suggested by Edison and the [Commission].

—it is not fair and just to simply award Edison a windfall of the interest rate differential between 5% and 9%.

—it is not fair and just to surcharge the consumers an interest rate well below market after five years of 'illegal rate' payment.

—it is not fair and just for Edison to be relieved of payment into a segregated escrow fund and then advocate an interest rate far less than any escrow account would have generated."

The circuit court, therefore, rejected the 5% interest rate urged by Edison and the Commission.

The circuit court continued, stating:

"A 9% interest rate is commensurate with the range within which the prime rate has fluctuated during the refund period from May 1986 to date and it is a rate which reasonably could have been secured had the collections been segregated and placed in an escrow outside of Edison's control. Further, it seems unlikely that these enormous amounts, in the hands of Edison for so long a period, would not have a real value of at least 9% to that utility.

The selection of an equitable interest rate is an exercise of judicial discretion guided by sound judgment—it is not a matter of pin-point precision. An interest rate of 9% is fair and just; it accomplishes the goal of making the ratepayer whole; it does not unfairly penalize Edison and it works to eliminate the potential for profit due to appellate delay. The appropriate interest rate is hereby declared to be 9%."

Because we agree with the circuit court and find that the 9% interest rate is an equitable and "just" term lying within its discretion, we affirm the circuit court's interest rate determination up to the date of its October 1989 interest rate order. In addition, we note that the circuit court retains jurisdiction to set a different interest rate, if appropriate, for any period subsequent to the date of its 1989 order.

## B

### Calculation of the Refund Amount: Actual or Projected Revenues

In its refund order, the circuit court determined that the calculation of the refund amount should be based on the *actual* revenue collected by Edison during the refund period rather than the projected revenues estimated in the Commission's Rate Order I. In this regard, the circuit court reasoned:

"At the time of the May 16, 1986 Order there was understandable uncertainty as to the actual dollars which would be produced by the various customer classes being compelled to pay the illegal rate during the stay period—the duration of the stay was also unknowable. The reporting provisions of the May 16 Order (paragraph 2 and 3) were aimed at replacing uncertainty with hard data. Edison's Twentieth Status Report, filed October 3, 1989, states that 'amounts accumulated in these accounts through August 31, 1989' total $1,887,765,000.

Experience gained over the past 3½ years has demonstrated that the projections contained in [Rate Order I] as the income-generating-potential of the Order were low-application of the October 24, 1985 rates during the refund period has generated considerably greater returns to Edison than estimated. There is no reason, logic or justification for continued reliance on the Commission's 1985 projections in the face of hard evidence that they are flawed.

The refund must be calculated based on the actual revenues collected by Edison from each of the customer classes since this Court's Order of April 29, 1986. The measure of excess payments is now known in terms of actual dollars and not by hypothetical dollars." *People ex rel. Hartigan v. Illinois Commerce Comm'n* (Cir. Ct. Cook Co. Oct. 31, 1989), No. 85—CH—10970 (refund methodology order).

The circuit court's determination to calculate the refund principal based on the actual revenues collected by Edison was a decision lying within its equitable discretion. We note that the circuit court made provision in its stay order for Edison to set up an account for the proceeds collected under Rate Order I and to submit to the circuit court bimonthly reports of this account so that it could track the actual amount of revenues collected under Rate Order I. Because we find the circuit court's determination to calculate the refund amount based on the actual revenues collected under Rate Order I to be "just," we affirm this term of the circuit court's refund order.

The appellate court, however, remanded this issue to the Commission because it failed to address this issue when the parties' petitions for rehearing were denied by operation of law. (*Hartigan II*, 202 Ill. App. 3d at 956-57.) The appellate court further instructed the Commission that, if it based the refund amount on the actual revenues collected under Rate Order I, it must offset the refund amount by any increase in actual operating costs experienced by Edison. Edison and the Commission urge that we affirm the appellate court on this issue and require that the refund principal be offset by actual cost increases. Intervenors and the *amicus*, Illinois Industrial Energy Consumers, oppose offsetting the refund amount by any increase in Edison's actual operating costs.

In addressing this issue, we note that the amount of money to be refunded consists of the difference between the rates collected pursuant to Rate Order I and the rates that should have been collected which were established in Rate Order II. (*Independent Voters*, 117 Ill. 2d at 105.) In establishing these rates, the Commission applies a ratemaking formula known as the reve-

nue requirement formula. (*Citizens Utilities Co.*, 124 Ill. 2d at 200-01.) Operating costs is a component of the revenue requirement formula. (*Citizens Utilities Co.*, 124 Ill. 2d at 200-01.) Therefore, operating costs should already have been taken into account by the Commission at the time it determined what the rates should have been in Rate Order II. Accordingly, we reverse the appellate court on this issue and hold that any increase in actual operating costs experienced by Edison has already been considered by the Commission and, therefore, may not be used to offset the amount of money to be refunded.

## C

### Refund Period

In its refund order, the circuit court held that the refund period began on April 29, 1986 (the date of its judgment reversing Rate Order I), and ran through December 31, 1989. Intervenors urge this court to affirm the circuit court's determination that the revenues collected in 1989 are to be included in the present refund from Rate Order I rates. Edison and the Commission, however, argue that the money collected in 1989 should not be included in the present refund. The appellate court agreed with Edison and the Commission and held that the refund period in the instant case runs from April 29, 1986, through December 31, 1988.

In order to address the issue of the proper refund period, it is necessary to set forth relevant Commission ratemaking history. On January 1, 1989, rates set by the Commission in its Sixth Interim Order in the *Business & Professional People I* case became effective. (*Business & Professional People I*, 136 Ill. 2d 192.) This court, however, held that the Sixth Interim Order was illegal and void and remanded the *Business &*

*Professional People* cause to the Commission. (*Business & Professional People I*, 136 Ill. 2d 192.) Thereafter, this court ordered Edison to comply with its refund offer contained in the Sixth Interim Order. (*Business & Professional People I*, 136 Ill. 2d at 247.) Pursuant to this court's mandate, the Commission entered an interim order providing for a refund of money collected under the Sixth Interim Order. (*Business & Professional People II*, 146 Ill. 2d at 193 (*Business & Professional People* refund order).) The Commission also entered an interim order rolling back the rates to the 1985 rates authorized in Rate Order I. *Business & Professional People II*, 146 Ill. 2d at 193 (*Business & Professional People* rollback order).

On remand in the *Business & Professional People* case, the Commission set new rates for 1989. (*Business & Professional People II*, 146 Ill. 2d at 191 (*Business & Professional People* remand order).) This court, however, has recently reversed the Commission's *Business & Professional People* remand order and has remanded the cause to the Commission for a second time. (*Business & Professional People II*, 146 Ill. 2d 175.) Therefore, the proper rates for 1989 are as yet undetermined. The net effect of these proceedings that have ensued in the *Business & Professional People* case is that the rates set in Rate Order I were the actual rates in effect from October 1985 to March 1991, when new rates became effective.

In the instant appeal, Edison and the Commission urge this court to affirm the appellate court's holding that the instant refund period runs from April 29, 1986, through December 31, 1988. They reason that the amount of money subject to refund in any given case is the difference between the illegal rates collected under an invalid rate order and the just and reasonable rates that should have been collected during

that particular time. Thus, they argue, since the Commission's rate determination which was to go into effect in January 1989 has been reversed and remanded twice, the reasonable and just rates for 1989 have not yet been determined. Therefore, they contend that any refund of money collected in 1989, if in fact one exists, cannot be determined until the Commission sets the proper 1989 rates.

Intervenors and the *amicus*, on the other hand, argue that any rate set by the Commission in the *Business & Professional People* case on remand can only operate prospectively and to apply these as yet undetermined rates to the 1989 period would violate the prohibition against retroactive ratemaking. These parties argue that, since Rate Order I's rates were in effect throughout 1989, the instant refund should include 1989 because any rates hereafter set in *Business & Professional People* cannot be applied back to 1989.

Under the Act, once the Commission sets a rate, the utility may not surcharge its customers retroactively if that rate is later found to have been too low. (*Business & Professional People II*, 146 Ill. 2d at 243.) This is so because of the prospective, legislative nature of the Commission's ratemaking function. (*Business & Professional People II*, 146 Ill. 2d at 243.) The instant case, however, involves a judicially established refund of money collected pursuant to an invalid rate order. As Edison and the Commission properly note, a refund encompasses the difference between the money collected pursuant to the invalid rate and the money that would have been collected pursuant to a just and reasonable rate. *Independent Voters*, 117 Ill. 2d at 105.

Although reversed and voided on appeal by this court, the rates set in the Sixth Interim Order which were supposed to be in effect beginning in January 1989 constituted a rate increase to recoup costs in-

curred in constructing three new nuclear generating facilities. (*Business & Professional People II*, 146 Ill. 2d at 190.) However, since these rates had not been properly established by the Commission, Rate Order I rates were charged to Edison's customers throughout 1989. If, on the second remand, the Commission properly sets the 1989 rates and those rates are higher than the Rate Order I rates charged in 1989, Edison cannot recover the difference from ratepayers because of the rule against retroactive ratemaking. In terms of a refund for 1989, however, the refund amount is calculated as the difference between illegal Rate Order I rates and the proper rates that should have been charged. If the Commission determines that the proper 1989 rates are higher than the Rate Order I rates charged in 1989, as it might conceivably determine due to the rate-basing of three new facilities, then a higher rate base could reduce the refund amount, if any, for the year of 1989. Conversely, if the proper 1989 rates are lower than the Rate Order I rates, the refund amount for 1989 could increase.

Therefore, we reverse the circuit court's determination to include the money collected in 1989 in the instant refund and hold that the instant refund period runs from April 29, 1986, through December 31, 1988. The refund for 1989, if any, must await the Commission's determination of what the proper 1989 rates should have been.

### D

Refund Recipients: Historical v. Current Customers

We next consider that portion of the May 1986 stay order which required Edison to pay refunds to the customers who actually paid the illegal Rate Order I rates (historical customers) "to the extent practicable." We

conclude that, in view of the unique facts present here, the trial court abused its discretion in ordering Edison to pay the refund to historical customers. The evidence in the record persuasively demonstrates that it is neither economical nor efficient to pay the refunds to historical customers.

Before Edison could issue refund monies to historical customers, it would be required to determine which customers actually paid the overcharges, the amount which should be refunded to each customer, and the last known mailing address of each customer. According to the evidence, at any given time Edison has approximately 3 million customers. Since mid-1986, approximately half of the historical customers have moved, some more than once and some to locations outside of its service area. Edison would therefore be required to process approximately 378 million records to ascertain the information necessary to award a refund to historical customers. Edison would then be required to issue and mail approximately 2 million refund checks to historical customers at their last known address. Many, however, may not live at their last known address and, therefore, would not even receive the refund checks. Thus, awarding refunds to historical customers would be inefficient, time-consuming and extremely costly, and would provide no guarantee that many of the customers who paid the Rate Order I rates will receive their portion of the refund. Furthermore, the cost of administering a refund in this manner would have to be taken out of the refund amount, thereby reducing the amount available for refund to ratepayers.

In light of the above, we agree with the appellate court that the illegal overcharges should be refunded to current, rather than historical, customers in the form of a credit. Awarding refunds to current cus-

tomers would entail minimal administrative expense and would ensure that the refunds are made as promptly as possible. In balancing the equities of this case, we conclude that the portion of the stay order which required Edison to pay refunds to historical customers is inequitable not only to Edison, but also to ratepayers and will not necessarily protect ratepayer interests. Accordingly, we reverse that portion of the order and remand to the circuit court with directions to order the refunds to be paid to current customers in the form of a credit.

## SUMMARY

In summary, we affirm that portion of the appellate court's judgment concerning the Commission's findings of reasonable/unreasonable delays. We reverse that portion of the appellate court's judgment which affirmed the Commission's use of its end-of-period AFUDC method and remand this issue to the circuit court and direct that it order the Commission to make more specific findings consistent with our opinion. We also reverse the appellate court's holding that the Commission has subject matter jurisdiction over the terms and implementation of the refund from Rate Order I rates and hold that the circuit court properly retained jurisdiction over the refund pursuant to Supreme Court Rule 305(b). We affirm the circuit court's refund order insofar as that order established a 9% interest rate and determined that the refund amount shall be calculated based on actual revenues collected pursuant to Rate Order I. We reverse, however, those portions of the circuit court's refund order which established the refund period and who the refund recipients shall be. In this regard, we hold that the instant refund period runs from April 29, 1986, through December 31, 1988, and that the refund shall be paid to current customers

in the form of a credit. We remand this cause to the circuit court with directions to enter an order consistent with this opinion and to implement the instant refund.

*Appellate court affirmed in part
and reversed in part;
circuit court affirmed in part
and reversed in part;
cause remanded with directions.*

JUSTICE FREEMAN concurring in part and dissenting in part:

I concur in all but part III-D of the majority's opinion. I do not agree with the majority's assumptions with respect to the methodology which Edison *would have to* employ in order to make refunds to historical customers. Specifically, I do not agree that ordering Edison to issue refunds to the customers who actually paid the excessive rates at issue rather than current customers would necessarily require it to process hundreds of millions of customer records or to mail millions of refund checks without knowing whether those checks would even reach such individual customers.

Rather, I believe that Edison could properly be ordered to issue refunds to historical customers and, at the same time, be allowed to make refunds only to such customers who respond to notice by publication of their right to a refund.

In the analogous case of class actions, it is well established that, as a matter of due process, individual notice to every class member is not required in all circumstances. (*Frank v. Teachers Insurance & Annuity Association of America* (1978), 71 Ill. 2d 583, 594.) Rather, the question of notice depends upon the circumstances of the individual action. *Miner v. Gillette Co.* (1981), 87 Ill. 2d 7, 15.

Inasmuch as individual notice is not a *per se* requirement in class action litigation, I see no reason why the composition of the "refund class" in this case must turn on an all-or-none determination. That is, why must the refund class consist of all historical customers or none at all? There is no legal reason why that must be the case. As such, I find it eminently more reasonable and equitable that the "refund class" consist of as many historical customers as could be notified, through reasonable means and efforts.

Notice by publication in at least one of the major newspapers in the 10 largest metropolitan areas in the country, for instance, should be fairly inexpensive. Moreover, to the extent that historical customers would respond to such notice and claim refunds, a windfall to current customers would be avoided.

I believe that notice by publication is a reasonable compromise of the all-or-none proposition which the majority assumes applies in this case. Therefore, I respectfully dissent from part III-D of the majority opinion.