METRO UTILITY COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

Second District    No. 2—93—0603

Opinion filed May 13, 1994.

G. Alexander McTavish, of Myler, Ruddy & McTavish, of Aurora (Clyde Kurlander, of counsel), for petitioner.

Donna M. Caton, of Illinois Commerce Commission, of Springfield, and G. Darryl Reed, of Illinois Commerce Commission, of Chicago (Carmen L. Fosco, Special Assistant Attorney General, of counsel), for respondent Illinois Commerce Commission.

J. William Goodwine and Robert S. Rigg, both of Lockwood, Alex, Fitzgibbon & Cummings, of Chicago (Thomas D. Paulius, of counsel), for respondent Chickasaw Homeowners Association.

JUSTICE PECCARELLI delivered the opinion of the court:
Metro Utility Company (Metro), a public utility under the Public

Utilities Act (Utilities Act) (220 ILCS 5/1—101 *et seq.* (West 1992)), appeals from two orders issued by the Illinois Commerce Commission (Commission). The orders granted Metro smaller increases in its utility rates than Metro had sought. Metro contends that the Commission erred when it: (1) determined to exclude certain items from Metro's test year expenses and rate base, and (2) altered Metro's capital structure by substituting a lower interest rate for a loan. Chickasaw Homeowners Association (CHA), an intervenor, submitted an answering brief in addition to the Commission's brief.

Metro provides water and sewer services to approximately 5,000 customers in six counties in northeastern Illinois. On April 16, 1992, Metro filed proposed revised tariff sheets with the Commission seeking a general increase in water and sewer service rates designed to produce approximately $1,025,000 in increased annual revenues. Metro calculated that the increased rates would produce an annual increase in water revenues of approximately $350,000, and an annual increase in sewer revenues of approximately $675,000, increases of approximately 32% and 87% respectively. Metro had not sought Commission approval for a rate increase since 1984. Metro selected the 1990 calendar year as its historic test year.

The Commission conducted hearings on the matter. The hearings began on June 17, 1992, and took place periodically until December 1, 1992. During the hearing process, Commission staff (Staff) proposed numerous adjustments to Metro's test year levels of expenses and rate base. CHA participated in the hearings and primarily addressed quality of service issues which are not part of this appeal.

After some give and take between Metro and Staff, Metro reduced its rate increase request to a level which would have resulted in increased aggregate revenues of approximately $725,000. Staff's final rate increase recommendations would have resulted in an aggregate revenue increase of approximately $340,000.

On March 10, 1993, the Commission issued an order on the matter, and on April 7, 1993, the Commission issued an amendatory order. The amendatory order corrected certain mathematical errors in the schedules attached to the first order. The narrative text of both orders (the ratemaking orders) is identical. The ratemaking orders granted Metro rate increases which would result in annual aggregate increases in revenues of approximately $402,000. Metro contends that the Commission erred when it adopted three Staff adjustments to Metro's test year level of expenses and rate base and when it determined that an interest rate on a Metro loan should be lowered. Metro maintains that these adjustments to its proposed rate

increases resulted in lower projected revenues of approximately $323,000.

Metro filed a timely application for a rehearing on these matters. The Commission denied Metro's application for a rehearing. This appeal followed.

Our supreme court recently set out the principles governing the role of the Commission and the standards for reviewing courts in administrative ratemaking proceedings. The court stated:

"The Commission is the administrative agency responsible for setting rates that public utilities may charge their customers. (Ill. Rev. Stat. 1985, ch. 111²/₃, pars. 9—102 through 9—202; *Hartigan I*, 117 Ill. 2d at 142.) The Commission is the fact-finding body in the ratemaking process. (*Hartigan I*, 117 Ill. 2d at 142.) It is governed by the Public Utilities Act (Act) (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1—101 *et seq.* [now 220 ILCS 5/1—101 *et seq.* (West 1992)]) \*\*\*. The Commission's powers are limited to those granted by the legislature in the Act. *Business & Professional People I*, 136 Ill. 2d at 201.

Because the Commission is an administrative agency, judicial review of its orders is limited. (*Business & Professional People I*, 136 Ill. 2d at 204.) Although the Commission is not required to make findings regarding every step, its findings of fact must be sufficient to allow for informed judicial review and will be affirmed if they are based on substantial evidence in the record. (See Ill. Rev. Stat. 1985, ch. 111²/₃, pars. 10—201(e)(iii) through (e)(iv); *Yowell v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1935), 360 Ill. 272, 275-76.) The Commission's findings of fact are *prima facie* correct and will not be overturned by a reviewing court unless they are against the manifest weight of the evidence, beyond the Commission's statutory authority, or violative of constitutional rights. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 206; *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 95.) Moreover, the burden of proof is on the party appealing the Commission's order. Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(d).

The Commission's interpretation of a question of law, however, is not binding on a reviewing court. (*Business & Professional People I*, 136 Ill. 2d at 204.) Upon review of a Commission order, the court may, in whole or in part, reverse and set aside the order, affirm the order, or remand the cause to the Commission for further proceedings. (*Hartigan I*, 117 Ill. 2d at 142.) Although the reviewing court cannot direct the Commission to take a specific action (*Hartigan I*, 117 Ill. 2d at 142) or judicially set utility rates (*Hartigan I*, 117 Ill. 2d at 142), the court may suspend rates which

it has found to be illegal (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—204(a))." (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1992), 148 Ill. 2d 348, 366-67.)

We will apply these principles to each of Metro's contentions of error.

Metro first contends that the Commission erred when it made a determination in the ratemaking orders to exclude from Metro's test year expenses all heavy maintenance and construction expenses incurred by Metro for work performed by a Metro affiliate, Midwest Construction Company (Midwest). Metro asserts that the exclusion of these expenses resulted in a reduction in Metro's contractual service expenses for the test year in the amount of $199,349, and a denial of Metro's right to recover, through prospective rates based on the test year expenses, such normal and recurring expenses in the future.

The ratemaking orders explained the Commission's determination that it would not recognize test year expenses that originated from unapproved contracts between Metro and its affiliate, Midwest. Metro admits that the test year expenses in question arose from contracts for which it had not obtained prior Commission approval as required by the Utilities Act. Nevertheless, Metro maintains that the Commission erred when it decided to exclude the expenses.

■ Metro first argues that collateral estoppel precluded the Commission from reviewing the expenses arising from the contracts in question because the propriety of the contracts was adjudicated by the Commission in a prior order (Docket No. 90—0026), and a related stipulation and agreement. Docket No. 90—0026 concerned a citation order issued by the Commission on January 18, 1990, which required Metro to show cause why the Commission should not impose penalties on Metro for alleged violations of the Utilities Act, including violations related to the provision of heavy maintenance and construction services to Metro by Midwest. The stipulation and agreement which was approved by the Commission in conjunction with Docket No. 90—0026 stated that its terms were the "final disposition of all the matters raised in this proceeding." The Docket No. 90—0026 order dated February 6, 1991, dismissed the January 18, 1990, citation of Metro with prejudice.

In the ratemaking orders, the Commission directly addressed the preclusion issue. The Commission determined that Docket No. 90—0026 did not preclude it from considering whether Metro's failure to obtain prior approval for the contracts in question impacted the rate case. The Commission stated:

"[T]he dismissal of Docket 90—0026 has no impact on this rate case. Docket 90—0026 was a citation proceeding wherein Metro was required to show cause why the Commission should not

impose a civil penalty on Metro. That docket, by its very nature, focused on Metro's activities prior to the Docket's inception. Neither the Order nor the stipulation stated that Metro no longer had to seek approval of the heavy maintenance and construction contract. Rather, Metro was no longer liable for a civil penalty for failing to get Commission approval prior to entering into the affiliated transactions."

Collateral estoppel, or issue preclusion, bars the relitigation of particular facts or issues decided in a prior adjudication between the same parties in a different cause of action. (*Housing Authority v. YMCA* (1984), 101 Ill. 2d 246, 252.) Courts often treat collateral estoppel as a branch of a broader doctrine, *res judicata*, which bars identical causes of action between parties or their privies. (*Housing Authority*, 101 Ill. 2d at 251.) Here, Metro specifically declines to invoke the doctrine of *res judicata*, but argues that the collateral estoppel branch of *res judicata* applies. Because the record shows that the prior action in the Docket No. 90—0026 proceeding was not the same as the current action, we agree that *res judicata* does not apply. We will therefore only address the collateral estoppel branch of the *res judicata* doctrine.

On appeal, the Commission contends that collateral estoppel does not apply to the ratemaking orders because the law is well settled that a Commission order, such as that in Docket No. 90—0026, has no *res judicata* effect. We agree.

The Commission is not a judicial body, and its orders are not *res judicata* in later proceedings before it. (*Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513.) "The concept of public regulation includes of necessity the philosophy that the commission shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding." 1 Ill. 2d at 513.

Even if collateral estoppel applied to Commission orders, we conclude that it would not apply in this case because the issues in question were not identical. The issue before the Commission in Docket No. 90—0026 was whether it should impose civil penalties on Metro for, *inter alia*, Metro's failure to obtain approval for contracts with an affiliate. The issue before the Commission in the ratemaking proceeding was whether Metro's failure to obtain approval for contracts with an affiliate should impact the ratemaking proceeding.

For these reasons, we determine that collateral estoppel did not preclude the Commission from reviewing the expenses arising from the contracts in question.

■ Metro next contends that even if the Commission was not

precluded from reviewing the heavy maintenance and construction expenses arising from Metro's contracts with Midwest, the Commission erred when it did not allow the expenses because it improperly based its decision on section 7—101 of the Utilities Act (220 ILCS 5/7—101 (West 1992)). Metro argues that section 7—101 is not dispositive in Commission ratemaking proceedings and that the Commission's reliance on section 7—101 is unfair because it prevents Metro from prospectively recovering similar expenses in future years which the Commission acknowledges Metro must necessarily incur.

The ratemaking orders clearly show that the Commission based its decision on section 7—101 of the Utilities Act. Section 7—101(3) provides, in relevant part:

"No management, construction, engineering, supply, financial or similar contract and no contract or arrangement for the purchase, sale, lease or exchange of any property or for the furnishing of any service, property or thing, hereafter made with any affiliated interest, as hereinbefore defined, shall be effective unless it has first been filed with and consented to by the Commission. The Commission may condition such approval in such manner as it may deem necessary to safeguard the public interest. If it be found by the Commission, after investigation and a hearing, that any such contract is not in the public interest, the Commission may disapprove such contract. Every contract or arrangement not consented to or excepted by the Commission as provided for in this Section is void.

The consent to any contract or arrangement as required above, does not constitute approval of payments thereunder for the purpose of computing expense of operation in any rate proceeding." 220 ILCS 5/7—101(3) (West 1992).

In the ratemaking orders, the Commission addressed the question of whether to recognize these and related expenses arising from contracts not approved under section 7—101. The Commission determined to not recognize the expenses and explained its determination in the ratemaking orders as follows:

"Metro, in its Brief on Exceptions, argues that it is unfair for the Commission to require Metro to absorb the costs of the heavy maintenance and construction contract. Specifically, Metro contends that it is not attempting to recover any costs that it incurred in the past with respect to these contracts. Rather through this rate case, Metro is attempting to recover these items in the future. Metro argues that to deny this future recovery constitutes a confiscation of Metro's property. In addition, Metro contends that Staff admitted that the type of expenses incurred under the heavy maintenance and construction contract are routinely incurred by utilities.

The Commission is not persuaded by Metro's arguments in its Brief on Exceptions. The Commission is of the opinion that an unapproved affiliated interest contract is void and the Commission is not required to recognize in a rate case the expenses pertaining to such an unapproved transaction. This is especially true in a case such as this where Metro has a history of failing to obtain approval of affiliated interest contracts."

On appeal, the Commission contends that expenses incurred by a public utility pursuant to an unapproved affiliated interest contract are void under section 7—101 and therefore should not be effective for ratemaking. The Commission argues that any other construction of section 7—101 would improperly allow Metro to do indirectly what it cannot do directly under the Utilities Act and would render section 7—101 virtually meaningless.

Metro counters that section 7—101 is not controlling in a ratemaking proceeding. Metro maintains that section 9—201 of the Utilities Act (220 ILCS 5/9—201 (West 1992)) governs ratemaking proceedings and requires a substantive determination based on the level of actual expenses in the test year including expenses which may arise from unapproved affiliated interest contracts. Metro argues that this is especially true in its case where the Docket No. 90—0026 proceeding imposed whatever civil penalties were appropriate for the unapproved contracts. Metro reasons that the denial of the expenses arising from such contracts in this ratemaking proceeding would impose double penalties on it for not obtaining contract approval. Metro asserts that whether the contracts in question were void under section 7—101 is irrelevant for its rate case because the expenses in question were necessary and proper and therefore must be considered in the ratemaking process.

The resolution of this issue requires us to construe 7—101 of the Utilities Act. Because the construction of a statute is a question of law (*Monahan v. Village of Hinsdale* (1991), 210 Ill. App. 3d 985, 993), the Commission's construction of section 7—101 is not binding on us and we may independently construe section 7—101 (*People ex rel. Hartigan*, 148 Ill. 2d at 367). However, because of an agency's experience and expertise, courts will generally give substantial weight and deference to the interpretation of a statute by the agency charged with the administration and enforcement of the statute. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152-53.

A court's primary function in interpreting a statute is to ascertain and give effect to the intent of the legislature in enacting the statute. (*Business & Professional People for the Public Interest v.*

*Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 207.) The statutory language is usually the best indication of legislative intent. (*Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund* (1993), 155 Ill. 2d 103, 111.) Courts should give statutory language its plain meaning and the fullest possible meaning to which it is susceptible, reading the statute as a whole, in order to effectuate legislative intent. *Collins*, 155 Ill. 2d at 111.

Based on these principles, we conclude that under section 7—101 the Commission was required to disallow Metro's unapproved affiliated interest contracts in Metro's ratemaking case. This is because the plain language of section 7—101(3) provides that every public utility contract or arrangement with an affiliated interest not approved by the Commission under section 7—101 shall not be effective and is void. (220 ILCS 5/7—101(3) (West 1992).) Because the unapproved contracts were of no effect and void, they could not serve as the basis for test year expenses.

We also find that Metro misconstrued the second paragraph of section 7—101(3). Metro concluded that the sentence "the consent to any contract or arrangement as required above, does not constitute approval of payments thereunder for the purpose of computing expense of operation in any rate proceeding" showed that the legislature did not intend section 7—101 to apply to ratemaking proceedings. On the contrary, under statutory construction canons, where a statute specifically enumerates exclusions from the operation of the statute, the statute should apply to all other cases. (See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1990), 203 Ill. App. 3d 424, 438.) Because the legislature excluded the necessary allowance of ratemaking expenses arising from a contract approved under section 7—101, we conclude that the legislature must have intended that the lack of approval of a contract under section 7—101 should result in the disallowance of ratemaking expenses arising from that contract.

We also conclude that reading the statute as a whole favors this interpretation of section 7—101. If a public utility could fail to seek approval for contracts with affiliates, as required by section 7—101, and still rely on those contracts in ratemaking proceedings, the utility would, to a great extent, be allowed to circumvent section 7—101, rendering it a nullity.

Metro's argument that it is being penalized twice is unpersuasive because it could have avoided any double penalty by simply doing what section 7—101 required it to do—seek approval for the contracts—before it sought its rate increases.

In sum, the plain language of section 7—101 shows a clear

legislative intent that public utilities obtain Commission approval for any contract with an affiliated interest. Under section 7—101 if approval is not obtained, then the contract is void and ineffective. Allowing a public utility to use an unapproved contract as the basis for establishing expenses in a rate case would allow the public utility to circumvent largely the section 7—101 approval requirement and defeat the legislative intent espoused in section 7—101. For all these reasons, we conclude that the Commission did not err when it disallowed the unapproved contracts in Metro's ratemaking case. Moreover, we have determined that, because under section 7—101 unapproved affiliated interest contracts are void, the Commission is required to disallow such contracts in a ratemaking case.

■ Metro next contends that the Commission erred when it disallowed other test year expenses arising from unapproved Metro contracts with affiliates. Metro claims that the Commission disallowed capital service contracts with Midwest resulting in annual revenue losses of approximately $49,000, and increased office lease expenses with affiliated persons of $6,000 annually.

Metro essentially takes the same position on these issues as it did on the heavy maintenance and construction issues. Metro maintains that the sole reason the Commission disallowed these expenses was the Commission's determination that it was not required to recognize expenses arising from transactions between public utilities and affiliated interests in a ratemaking case where the transaction lacked prior section 7—101 approval. Metro asserts that the Commission's decision denies it the right to recover prospectively revenue for necessary expenses which it actually incurred. Metro argues that the Commission's decision is contrary to the evidence and the law, violates fundamental ratemaking principles because it is unsupported by adequate findings of fact, and violates Metro's constitutional due process rights.

We note that it is undisputed that Metro did not obtain the Commission's prior approval for the contracts and agreements in question. It is also clear that the primary reason for the Commission's decision to disallow the expenses was Metro's failure to obtain prior approval as required by section 7—101. Thus, the question before us again is whether a public utility's failure to obtain Commission approval of contracts with affiliated interests under section 7—101 of the Utilities Act requires the Commission's disallowance in a ratemaking proceeding of expenses arising from the unapproved contracts.

For the same reasons set forth above, we conclude that the utility's failure to obtain prior Commission approval of the contracts

requires the Commission's disallowance of the expenses. Metro's due process arguments are unpersuasive. The record shows that Metro knew it was required to obtain prior approval for the contracts or they would be void. If Metro wanted the expenses in question to be included with its test year expenses, it could have sought Commission approval of the underlying contracts before it filed its rate case.

For these reasons, we conclude that the Commission did not err when it disallowed the expenses in question.

■ Metro's final contention on appeal is that the Commission erred when it decided to substitute a lower interest rate on a previously approved Metro debt resulting in a reduction in Metro's allowed rate of return. In an order filed on October 1, 1986 (Docket No. 83—0181), the Commission granted Metro approval to issue long-term debt in the amount of $1,504,430 at a rate of 12% per year to its affiliate, Midwest. In the ratemaking orders, the Commission accepted a proposal based on the testimony of Staff's witness, William G. Saxe (Saxe), to substitute an interest rate of 9% for the 12% rate previously approved on the debt to Midwest. The reduction in the interest rate would reduce Metro's cost of capital thereby reducing Metro's allowed rate of return.

Metro argues that the Commission's determination to lower the loan rate erroneously shifts the burden of proof to Metro in a matter on which it previously obtained Commission approval in Docket No. 83—0181. Metro also contends that the Commission's determination was contrary to fact because it rests on testimony of Saxe that market conditions would allow Metro to refinance the debt at a rate lower than 12% when, given Metro's actual credit rating, this would not in fact be possible. Metro concludes that the Commission's determination was unsupported by adequate findings of fact, unsupported by substantial evidence, and contrary to law.

Saxe proposed several adjustments to Metro's long-term cost of debt. Metro only contested the proposed adjustment in the interest rate on its debt with Midwest. Saxe noted that the 12% interest rate on that debt was established by Docket No. 83—0181 when interest rates in general were much higher than current rates. Saxe concluded that Metro should refinance its debt with Midwest at lower current rates.

The Commission addressed this issue in the ratemaking orders. The Commission stated:

> "Mr. Saxe stated that Metro could refinance this debt at a 9% interest rate. Mr. Saxe supports this contention on two bases. First, he notes that the July 24, 1992 issue of Soloman Brothers *Bond Market Roundup* shows that the yield on A to BBB rated

25-30 year utility bond issues were 8.25% to 8.45%. Additionally, he asserts that in response to a Staff data request Metro stated that La Salle National Bank indicated that if Metro desired to convert its present 5 year variable rate term note to a five year fixed rate, the rate would be in the range of 9% to 9.25%.

Metro contends that this adjustment is unrealistic because it is unlikely that Metro could refinance the loan at 9% as Staff suggests.

The terms of the affiliated interest loan are unreasonable in light of current economic conditions. The loan was made at a time when the prevailing interest rates were significantly higher than they are today. Metro has not offered any evidence to indicate that it has attempted to refinance this loan. The Commission agrees with Mr. Saxe that based on current interest rates, the loan could be refinanced at a lower rate. The Commission, therefore, accepts Staff's adjustment."

Wayne A. Newman (Newman), Metro's comptroller, responded to Saxe's testimony. Newman testified as follows:

"Q. Why does [Metro] disagree with Mr. Saxe's proposed 9% rate?

A. Metro simply cannot at this time go to the market and borrow another $1.5 million at 9% or any similar rate. The Company was very pleased with the financial arrangements with the La Salle Bank, but negotiations and conclusion of those arrangements were most difficult. Any suggestion that La Salle would provide additional funds at 9.0 to 9.25% is not realistic. Moreover, Metro is hardly comparable to an 'A' or 'BBB' rated utility regarding matters of debt issuance.

During past years when Metro could not raise funds, Midwest served as its 'banker' and was, realistically, its only source of significant cash sums. The dollars Metro borrowed from Midwest, in reality, have represented and continue to represent Midwest's equity capital and should carry not less than a fair rate of return on equity. Moreover, the 12% approved by the Commission in Docket No. 83—0181 should be used in this proceeding until such time as new arrangements can be made by the Company which should be the subject of Commission order and approval."

The Commission contends that it has provided sufficient findings and analysis to support its conclusions and to allow for judicial review. The Commission argues that the record supports its determination to reduce the interest rate on Metro's debt to Midwest. We agree.

Based on the general principles governing administrative ratemaking proceedings quoted above, a reviewing court should affirm

the Commission's findings of fact if they are based on substantial evidence in the record. (*People ex rel. Hartigan*, 148 Ill. 2d at 366.) Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Metro Utility v. Illinois Commerce Comm'n* (1990), 193 Ill. App. 3d 178, 184.

Here, the Commission set out findings of fact based on substantial evidence. Saxe's conclusion that Metro could refinance its loan at a lower rate was based on Saxe's evaluation of the current credit market for public utilities. The fact that Metro presented contradictory evidence is insufficient to reverse the Commission's order because a reviewing court may not substitute its interpretation of the evidence for that of the Commission. *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 147.

Moreover, the Commission's findings of fact are *prima facie* correct, and the burden of proof rests with the party appealing a Commission order. (*People ex rel. Hartigan*, 148 Ill. 2d at 367.) Metro did not provide evidence that it had attempted to obtain a replacement loan at a lower rate than on its loan with Midwest, or that its credit rating was different than that implied by Saxe. Consequently, Metro did not overcome the *prima facie* correctness of the Commission's findings of fact.

We cannot say that the Commission's findings were against the manifest weight of the evidence. Accordingly, we will not overturn the Commission's findings. See *People ex rel. Hartigan*, 148 Ill. 2d at 367.

For these reasons, we conclude that the Commission did not err when it decided to substitute a lower interest rate on Metro's loan in the ratemaking proceeding.

Based on the foregoing, we affirm the Commission's orders of March 10, 1993, and April 7, 1993.

Affirmed.

WOODWARD and McLAREN, JJ., concur.