THE CITY OF CHICAGO *et al.*, Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

First District (4th Division)    No. 1—96—1810

Opinion filed December 24, 1997.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Thomas J. Bamonte, Assistant Corporation Counsel, of counsel), for petitioners.

Mayer, Brown & Platt, of Chicago (Stephen J. Mattson, Michele Odorizzi, Barbara E. Cohen, and J. Tyson Covey, of counsel), for respondent Illinois Telephone Association.

James E. Ryan, Attorney General, of Chicago (James E. Weging, Assistant Attorney General, of counsel), for respondent Illinois Commerce Commission.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

The City of Chicago (the City) and Chicago Emergency Telephone System Board, appellants, appeal from the assertion of regulatory authority by the Illinois Commerce Commission (Commission), appellee, over the use of 9-1-1 surcharges by local governments to fund their 9-1-1 emergency systems. The Commission promulgated regulations exempting users of a class of telephone service, called Centrex, from paying the full 9-1-1 surcharge rate.

The issue in this case is whether the Emergency Telephone System Act (the Act) (50 ILCS 750/0.01 *et seq.* (West 1996)) grants the Commission the authority to regulate the assessment of 9-1-1 surcharges that local governments impose on subscribers to finance their 9-1-1 emergency telephone systems.

We reverse and determine that the Commission did not have the authority to issue a regulation concerning how subscribers are assessed a surcharge that is used to finance the 9-1-1 emergency telephone system of a local government.

■ The Act was enacted to officially establish 9-1-1 as the uniform statewide emergency telephone number for use in Illinois and to encourage local governments to develop and improve emergency communications procedures and facilities. 50 ILCS 750/1 (West 1996). The legislature declared that by the end of 1985 every firefighting, police, ambulance, medical or other emergency service agency in a county having a population of 100,000 or more should have in opera-

tion a 9-1-1 emergency telephone system. 50 ILCS 750/3 (West 1996). The legislature specified the services to be included in the 9-1-1 systems. 50 ILCS 750/4 through 6.1 (West 1996).

The legislature authorized the Commission to establish a general overview or plan to carry out the implementation of 9-1-1 systems. 50 ILCS 750/7 (West 1996). The "[t]echnical and operational standards" for the development of local 9-1-1 systems were to be established and reviewed by the Commission on or before December 31, 1979. 50 ILCS 750/10 (West 1996). In regard to the financing of 9-1-1 systems, the Act states:

> "The Commission, with the advice and assistance of the Attorney General, shall assist local public agencies and local public safety agencies in obtaining financial help to establish emergency telephone service, and shall aid such agencies in the formulation of concepts, methods, and procedures which will improve the operation of systems required by this Act and which will increase cooperation between public safety agencies." 50 ILCS 750/8 (West 1996).

The Commission was also authorized to approve or disapprove plans for local 9-1-1 emergency systems. 50 ILCS 750/11 (West 1996).

Pursuant to the Act, in 1979, the Commission adopted regulations regarding the requirements for the establishment of 9-1-1 systems and operating standards for them. 83 Ill. Adm. Code § 725.100 et seq. (1996).

Local governments are empowered to levy a gross-receipts tax on the telecommunication companies' receipts for the business originating within the corporate limits of the municipality. 65 ILCS 5/8—11—2 (West 1996). In 1987, the legislature amended the Act to permit local governments to impose the 9-1-1 surcharge in addition to the gross-receipts tax levied under section 8—11—2 of the Illinois Municipal Code. 50 ILCS 750/15.3 (West 1996); Pub. Act 85—978, § 4, eff. December 16, 1987.

The Act under new section 15.3 grants local governments the authority to impose a monthly 9-1-1 surcharge on billed subscribers of network connections provided by telecommunication carriers at a rate established by local referendum. 50 ILCS 750/15.3(a) (West 1996). The Act also provides that any municipality that had been imposing a 9-1-1 surcharge prior to the effective date of the 1990 amendments could continue to do so. 50 ILCS 750/15.3(i) (West 1996).

The monthly surcharge "shall be collected from the subscriber by the telecommunications carrier *** as a separately stated item on the subscriber's bill." 50 ILCS 750/15.3(f) (West 1996). The section further provides that the surcharge then "shall be paid to the partic-

ular municipality or county or Joint Emergency Telephone System Board not later than 30 days after the surcharge is collected." 50 ILCS 750/15.3(g) (West 1996). The rate of surcharge in the City of Chicago is capped under the Act:

"A municipality with a population over 500,000 may not impose a monthly surcharge in excess of $1.25 per network connection." 50 ILCS 750/15.3(h) (West 1996).

The Act defines "network connections" as:

"[T]he number of voice grade communications channels between a subscriber and a telecommunications carrier's public switched network without the intervention of any other telecommunications carrier's switched network which would be required to carry the subscriber's inter-premises traffic, which connection either (1) is capable of providing access through a public switched network to a 9-1-1 Emergency Telephone System if one exists, or, (2) if no system exists at the time a surcharge is imposed under Section 15.3 which would be capable of providing access through the public switched network to the local 9-1-1 Emergency Telephone System if one existed." 50 ILCS 750/2.12(a) (West 1996).

Local governments are authorized to issue debt secured by the revenues of the 9-1-1 surcharge. 50 ILCS 750/15.3(j) (West 1996). The 1987 amendments to the Act require local governments to establish an Emergency Telephone System Board. 50 ILCS 750/15.4(a) (West 1996).

The City imposed a 9-1-1 surcharge as authorized by section 15.3 of the Act. In 1993, the City issued $222,230,000 in general obligation bonds to finance a new 9-1-1 system.

In 1995, a hearing officer of the Commission issued a proposed order, including the addition of a new subpart entitled "surcharge," which provided in part:

"For Centrex-type service, each telecommunications carrier shall assess the surcharge equal to one network connection for every ten Centrex lines, except for those municipal or county lines exempt from surcharge under the Act. Each telecommunications carrier's tariff rates for nonrecurring and recurring services attributable to Centrex-type lines shall utilize the same ratio as utilized for surcharge." 83 Ill. Adm. Code § 725.800(b) (1996).

The effect of the regulations was that only one surcharge could be assessed for every 10 Centrex telephone lines, thereby reducing the revenue the City of Chicago would collect. The City filed exceptions to the hearing officer's proposed order including the issue of the 1 to 10 ratio for the Centrex surcharge assessment. In 1996, the proposed rules, including the reduced Centrex rate, were adopted. The Commission denied the rehearing requested by the City. The

City filed a petition for review and notice of appeal pursuant to Supreme Court Rule 335(a) (155 Ill. 2d R. 335(a)) and section 10—201(a) of the Public Utilities Act (the Utilities Act) (220 ILCS 5/10—201(a) (West 1996)).

Petitioners argue that the Act did not authorize the Commission to regulate the 9-1-1 surcharge and alternatively that, if section 10 of the Act (50 ILCS 750/10 (West 1996)) did so authorize the Commission, section 10 did not grant the Commission power to promulgate regulations after the 1979 deadline for the Commission to establish technical and operational standards. Petitioners also argue that the surcharge regulation was contrary to the Act's definition of network connections.

■ The Commission is an administrative agency that was established by the Utilities Act. 220 ILCS 5/2—101 (West 1996). Under the Utilities Act, the reviewing court

> "shall reverse a Commission rule, regulation, order or decision, in whole or in part, if it finds that:
> ***
> B. The rule, regulation, order or decision is without the jurisdiction of the Commission." 220 ILCS 5/10—201(e)(iv)(B) (West 1996).

■ A court's primary function in interpreting a statute is to ascertain and give effect to the intent of the legislature in enacting the statute. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 207, 585 N.E.2d 1032 (1991); *Metro Utility Co. v. Illinois Commerce Comm'n*, 262 Ill. App. 3d 266, 273-74, 634 N.E.2d 377 (1994). Courts should give statutory language its plain meaning and the fullest possible meaning to which it is susceptible, reading the statute as a whole, in order to effectuate legislative intent. *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund*, 155 Ill. 2d 103, 111, 610 N.E.2d 1250 (1993); *Metro Utility*, 262 Ill. App. 3d at 274.

■ Because of an agency's experience and expertise, courts will generally give substantial weight and deference to the interpretation of a statute by the agency charged with the administration and enforcement of the statute. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152-53, 447 N.E.2d 295 (1983); *Metro Utility*, 262 Ill. App. 3d at 273. But the construction of a statute is a question of law, and the administrative agency's interpretation is not binding upon a reviewing court. *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 367, 592 N.E.2d 1066 (1992); *Metro Utility*, 262 Ill. App. 3d at 273. A reviewing court therefore is not bound to accept the Commission's conclusions regard-

ing its jurisdiction. *Peoples Gas Light & Coke Co. v. Illinois Commerce Comm'n*, 222 Ill. App. 3d 738, 743, 584 N.E.2d 341 (1991). The review of a question of law in the appellate court is *de novo*. *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 166, 645 N.E.2d 516 (1994).

Where the language of a statutory provision is clear, the court must give it effect without resorting to other aids for construction. *West v. Kirkham*, 147 Ill. 2d 1, 6, 588 N.E.2d 1104 (1992); *People v. Boykin*, 94 Ill. 2d 138, 141, 445 N.E.2d 1174 (1983). Where a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions, despite the lack of any negative words of limitation. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill 2d 76, 82, 630 N.E.2d 820 (1994).

The Centrex surcharge order was the first order issued by the Commission in which it claimed authority to regulate the assessment of 9-1-1 surcharges by a municipality to fund its 9-1-1 system. Users of a class of telephone service known as Centrex were exempt by the order from paying the 9-1-1 surcharge at the full rate. It is alleged that the reduced rate that Centrex users pay Chicago will result in the loss of over $2 million in 9-1-1 surcharge revenue available for operating its 9-1-1 emergency system.

In December of 1979, the Commission issued an order pertaining to the standards of service applicable to 9-1-1 emergency telephone systems such as engineering, operations and facilities. The City of Peoria appealed the order in the case of *City of Peoria v. Illinois Commerce Comm'n*, 132 Ill. App. 3d 835, 477 N.E.2d 749 (1985). The court held that, when the legislature enacted the Act to create a uniform statewide emergency system, it intended that the Commission would be the agency that would ensure that 9-1-1 systems are functioning properly once they are established. *City of Peoria*, 132 Ill. App. 3d at 838. The court stated that section 10 (50 ILCS 750/10 (West 1996)) mandates that the Commission establish and review technical and operational standards for the development of local emergency telephone systems. *City of Peoria*, 132 Ill. App. 3d at 838. The court also held that the Commission's order was an appropriate exercise of the Commission's statutory authority. *City of Peoria*, 132 Ill. App. 3d at 839. The court further held that the Commission was the agency responsible for the implementation and ongoing supervision of 9-1-1 systems. *City of Peoria*, 132 Ill. App. 3d at 839. At the time this decision was rendered, the statute authorizing local governments to assess a surcharge for emergency telephone service had not been enacted.

■ The surcharge statute (50 ILCS 750/15.3 (West 1996)) was enacted in 1987. The provisions of the Act and the decision in *City of Peoria* clearly authorized the Commission to promulgate rules for the technical and operational standards for Illinois local emergency telephone systems.

Section 8 of the Act was enacted in 1975. It states in part as follows:

> "The Commission with the advice and assistance of the Attorney General, shall assist local public agencies and local public safety agencies in obtaining financial help to establish emergency telephone service, and shall aid such agencies in the formulation of concepts, methods, and procedures which will improve the operation of systems required by this Act and which will increase cooperation between public safety agencies." 50 ILCS 750/8 (West 1996).

The question is whether this section authorizes the Commission to regulate the rate a local government uses to assess surcharges to telephone subscribers who use 9-1-1 service.

■ Regarding the authority of the Commission, it has been held that the Commission only has those powers given it by the legislature through statutes. *Union Electric Co. v. Illinois Commerce Comm'n*, 77 Ill. 2d 364, 383, 396 N.E.2d 510 (1979). Under the Utilities Act (220 ILCS 5/4—101 to 4—502 (West 1996)), the Commission has the general supervision of public utilities. In supervising the utilities, the Commission may examine the rates and other charges of the utilities and review compliance of the utilities with the Utilities Act. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 201-02, 563 N.E.2d 877 (1990).

■ The Commission is an administrative agency. Since an administrative agency is a creature of the legislative body from which it derives its existence and authority, any of its acts or orders that are unauthorized by the statute are void. *The Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115, 129, 357 N.E.2d 785 (1977); *City of Chicago v. Fair Employment Practices Comm'n*, 65 Ill. 2d 108, 357 N.E.2d 1154 (1976); *People ex rel. Highway Transportation Co. v. Biggs*, 402 Ill. 401, 409, 84 N.E.2d 372 (1949). Statutes in derogation of the common law are to be construed in favor of persons sought to be subjected to their operation. *Barthel v. Illinois Central Gulf R.R. Co.*, 74 Ill. 2d 213, 220, 384 N.E.2d 323 (1978); *Summers v. Summers*, 40 Ill. 2d 338, 342, 239 N.E.2d 795 (1968); *Turgeon v. Commonwealth Edison Co.*, 258 Ill. App. 3d 234, 251, 630 N.E.2d 1318 (1994). An agency's authority must arise either from the express language of the statute or by fair implication and intendment from the express

provisions of the act as an incident to achieving the objectives for which the agency was created. *Greer v. Illinois Housing Development Authority*, 150 Ill. App. 3d 357, 383, 501 N.E.2d 723 (1986).

■ Thus, the Act must contain a strong indication of legislative intent to authorize the Commission to regulate 9-1-1 surcharges. In section 8 of the Act the Commission was directed, with the advice and assistance of the Attorney General, to assist local agencies in obtaining financial help to establish emergency telephone service. Section 15.3 in 1987 granted local government authorities the power to impose a surcharge on billed subscribers who use 9-1-1 emergency telephone service. It is difficult to see how the legislature could have intended the Commission to regulate surcharges that were not in existence until 12 years later. The authority to assist a local government to obtain financial help to establish 9-1-1 service is different from the power to regulate how much financial help to operate 9-1-1 service is obtained. Nowhere in the entire surcharge statute (50 ILCS 750/15.3 (West 1996)) is the Commission granted the authority to regulate anything.

Section 15.3(e) specifically authorizes a municipality at any time, by ordinance, to change the rate of the surcharge imposed as long as it does not exceed the maximum rate which, for the City of Chicago, is $1.25 per network connection under section 15.3(h). 50 ILCS 750/15.3(e), (h) (West 1996). By setting a cap on the maximum rate that the City of Chicago could charge, the legislature exercised its power to control how much revenue a municipality can collect from 9-1-1 subscribers. There is no indication that the legislature wanted to share that power with the Commission.

No other restrictions are imposed upon a municipality in changing the surcharge rate. The municipality does not have to seek the approval or assistance of the Commission before or after it sets the surcharge rate under that statute.

When a local government imposes a surcharge for the first time, the Commission has no role to play. Under section 15.3(c), the local municipal or county officials must first enact an ordinance permitting a surcharge. 50 ILCS 750/15.3(c) (West 1996). Then the voters must pass a referendum permitting a surcharge rate. However, local governments, like Chicago, that had previously imposed a surcharge were excused from holding a referendum. The Commission is not granted the authority to review a surcharge rate at any time. A surcharge rate established by a referendum cannot be changed by the Commission.

The Utilities Act does grant the Commission the authority to regulate public utilities. 220 ILCS 5/4—101 to 4—502 (West 1996).

The City of Chicago's 9-1-1 emergency telephone system is not a public utility. It only provides a useful service to those subscribers who use a public utility service to telephone a local emergency system for help. Also, the Utilities Act specifically excludes public utilities "owned and operated by any *** municipal corporation" from being subject to comprehensive regulation by the Commission. 220 ILCS 5/3—105 (West 1996)). Thus the Utilities Act does not grant the Commission the authority to regulate any emergency telephone system owned by a local government.

Municipalities historically have passed ordinances to raise revenue to pay for firefighting, police and emergency medical services. The emergency telephone service enables a municipality to more quickly provide these services. The Commission has no authority to regulate the assessment of municipal taxes upon citizens who benefit from these vital services.

The surcharge regulation by the Commission may have been based in part upon the Commission's consideration of technical issues, such as whether a Centrex system is directly connected to the public switched network within the meaning of the Act, but the regulation does not concern itself with how the 9-1-1 system operates. Rather, the surcharge regulation concerns how the surcharge shall be assessed on Centrex telephone systems. We conclude that section 10 (50 ILCS 750/10 (West 1996)) was not intended to cover the assessment of a 9-1-1 surcharge based on the plain meaning of "technical and operational." Nowhere does the Act expressly authorize the Commission to oversee how the surcharge is assessed. We hold that the surcharge regulation is invalid.

The legislature has the power to limit the surcharge for Centrex-type service or it may expressly grant the Commission the authority to regulate surcharges in the future after further study.

We do not need to reach the issues of whether the Commission had continued authority to promulgate standards after 1979 and whether the surcharge regulation was contrary to the Act's definition of network connections.

Sections 725.800 and 725.805 of the regulations (83 Ill. Adm. Code §§ 725.800, 725.805 (1996)) are hereby vacated and declared void.

Reversed.

WOLFSON and BURKE, JJ., concur.